UNITED STATES of America

v.

Cassino CLARK.

Crim. A. No. 22960.

United States District Court
E. D. Pennsylvania.

Sept. 3, 1968.

See also, D.C., 289 F.Supp. 608.

Drew J. T. O'Keefe, John R. Galloway, Philadelphia, Pa., U. S. Attorney's Office, for plaintiff.

William P. Stewart, Philadelphia, Pa., for defendant.

## OPINION

MASTERSON, District Judge.

The defendant, Cassino Clark, has been charged in an indictment filed August 1, 1967, with one count of robbery of a post office using a dangerous weap-

on in violation of Title 18 U.S.C. § 2114. He now moves both to suppress material evidence, taken from his person and from his residence, and to suppress at trial the identification testimony of five government witnesses. A full hearing on these two motions was conducted between January 2 and January 5, 1968, and subsequently counsel briefed and argued the relevant legal issues. At the hearing the following relevant facts were established.

At approximately 3:25 P.M. on June 29, 1967, a lone Negro male entered the United States Post Office at 5848 Market Street in Philadelphia, Pennsylvania. He walked over to the service counter and, while brandishing a sawed-off shot gun, he vaulted over the counter into the private work area of the Post Office. At this time he ordered the Post Office employees to lie on the ground and not to look at him. He also ordered one of them, Mr. Harry White, to fill an overnight bag with money. After getting approximately $1200.00 he dashed out of the Post Office.

A short time after the robbery two members of the Philadelphia Police Department, Detective Ralph Geary and Detective George Busch, arrived at the Post Office and interviewed the employees who had witnessed the robbery. N.T. pp. 19–20. A member of the Philadelphia Mobile Crime Detection Unit, Mr. Harry Gratman, accompanied them, and, after sealing off an area of the Post Office including the service-counter, he "lifted" several palm prints from the counter. N.T. p. 25.

Earlier the same day a Special Investigator for the United States Treasury Department, Mr. J. H. Pearson, had received information from an unidentified informant, whom he considered reliable, that a robbery was to be committed in West Philadelphia. N.T. pp. 223–224.[1]

---

1. The defendant contended at the hearing that he was entitled to know the identity of the informer. The Government disagreed on the basis that there was no purpose in disclosing the identity of the informer at this stage of the proceedings. It was decided that the identity of the informer need not be disclosed. See, McCray v. State of Illinois, 386 U.S. 300, 311–312, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967).

After 5:00 P.M. this informer notified Pearson that the defendant had robbed the Post Office, N.T. p. 225, and Pearson immediately relayed this information to the investigating police, telling them also that he considered his source to be reliable. N.T. pp. 174–175. Acting upon this information, another investigating officer, Sergeant Fencl from the Major Crimes Division, some time between 5:30 and 6:30 P.M. asked the Mobile Crime Laboratory to compare the palm prints found on the Post Office counter with those of Cassino Clark. N.T. p. 83.

At approximately 6:45 P.M. an officer from the Laboratory informed Detective Busch that a comparison of the palm prints indicated that the defendant was the person whose prints had been lifted from the Post Office counter. Shortly thereafter Busch obtained a warrant for the arrest of the defendant from a Philadelphia magistrate. N.T. p. 28. Busch's affidavit in support of the warrant, which was introduced into evidence at the hearing, contained only the simple statement that the defendant had committed the Post Office robbery.[2]

That evening at 9:00 P.M. Captain Gregore Sambor of the Philadelphia Police, apprised of Clark's implication by both the palm print comparison and the report from the informer, directed a prowl car officer, Sergeant Clark Rich, to be on the lookout for a pink and white Rambler in which the informer had said Clark would be riding. N.T. pp. 128, 186. Sergeant Rich sighted the car making an improper turn at an intersection,

but the car eluded his chase. This officer then sent out a "wanted message", based upon the traffic violations he had observed, and at 9:50 P.M. the car was apprehended. The arresting officers, Patrolmen Howard Bradway, Carl Richards, and Robert McBride, who had not been told why the car was to be stopped, were told to take the two occupants of the car, the defendant and the driver, to the West Detective Division at 5500 Pine Street in Philadelphia. Detective Busch was at the police station when they arrived and he searched the defendant, removing a key and $287.00 in cash from him. N.T. pp. 18–19.

Some time prior to the defendant's arrest, Stephen Combs, an Inspector for the Post Office Department, pursuant to the directions of Captain Sambor requested five Post Office employees, Edmond Lederer, Harry White, Reuben Brachman, Hobart Maddox, and James J. Vaccaro, to come to the West Detective Division for the purpose of viewing photographs of suspects. N.T. pp. 127, 303. At the direction of Captain Sambor, six photographs, to be as "* * * similar as possible * * *", had been taken from the police files. N.T. pp. 271, 284. Because the defendant was then a strong suspect, based upon the palm print identification and the informer's information, his photograph was included among the group of six. The pictures were of six Negro males, all of about the same general height, weight, build, complexion and age. N.T. pp. 107, 127, 134.[3] The police arranged the photographs two abreast in a line. N.T. p. 298.

---

2. At the hearing Busch testified that he had reviewed the facts of the case with the Magistrate. Busch was unable, however, to specify what he had said. N.T. pp. 208, 209, 405, 406. In any event, the affidavit itself contains only the bald statement that the defendant had committed the crime, and, in determining whether the Magistrate had reasonable cause to issue the warrant, the Court must look only to the face of the affidavit. Cf. Aguilar v. United States, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). As discussed infra, however, the existence of the warrant does not preclude inquiry

into other factors which might support a conclusion that the arrest was made with probable cause.

3. The photographs were marked as exhibits and were introduced into evidence at the hearing. The subjects pictured in the photographs were generally similar in appearance to the defendant. The photograph of the defendant, however, was distinguishable from the other five photographs in that it had been altered to erase an earlier inscription written upon its face noting the defendant's name and address. N.T. pp. 272–273.

Each witness individually examined the photographs, and the police neither mentioned the defendant's name nor suggested which of the pictures should be selected. N.T. pp. 106–110, 136, 295–296, 322–323, 354, 366, and 383. Two of the five employees, Hobart Maddox and Harry White, positively identified the defendant's photograph as representing the individual who had robbed the Post Office. N.T. pp. 105, 306–307, 323. Three employees, James Vaccaro, Reuben Brachman, and Edmond Lederer, identified the defendant's photograph but told the police that their identification was not positive. N.T. pp. 106, 160. During this time and later, after all the witnesses had examined the photographs, there was no conversation among them about their identification of the defendant. N.T. pp. 306–307.

Shortly after 10:00 P.M. Combs asked four of the employees who had remained at the station to look into a detention room. N.T. pp. 112, 287. The defendant was sitting in this room with five other Negro men, i. e. the driver of the Rambler, two Negro policemen dressed as civilians, and two other men who were brothers and suspects in connection with an unrelated crime. N.T. pp. 147–149. The men all were dressed similarly: all wore dark civilian slacks, none wore a tie, all were handcuffed, and all wore short-sleeve shirts—four of the men wore white shirts while the defendant and his companion wore Banlon shirts. N.T. pp. 119, 130. The men were not particularly similar, however, in regards to their physical characteristics.[4]

Inspector Combs led each of the four witnesses individually to a window in the door of the room for purposes of making the observation. Combs neither mentioned the defendant's name to these witnesses nor did he suggest that the defendant was a strong suspect. N.T. pp. 115, 301–302. Maddox and White again positively identified the defendant as the robber. N.T. pp. 114, 131, 154, 157. Lederer and Brachman also testified, however, that they had identified the defendant at that time. N.T. pp. 368, 354.

After all of the employees had looked into the detention room they remained at the station house for several minutes, during which time they saw the police take the defendant from the room. N.T. pp. 310, 311. At about this time, between 11:00 and 11:30 P.M., and after both the display of the photographs and the observation of the defendant in the detention room, Detective Geary interrogated the defendant and told him that he was being arrested. N.T. p. 245.[5]

Detective Busch then obtained a search warrant for the defendant's premises from the same Magistrate who had issued the arrest warrant earlier that day. N.T. pp. 32–35. Issuance of this war-

---

**4.** The evidence indicated that Sergeant Alexander Childs was 5′8″ tall, weighed 165 pounds, and was 39 years old, that Detective Melvin Mayfield was 6′ tall, weighed 205 pounds, and was 34 years old, and, that the defendant was 5′9″ tall, weighed 131 pounds, and was 25 years old. N.T. pp. 252–255, 261–266, 276. The evidence also indicated that there was a "gross difference" in size between the defendant and his companion, although there was no particularized evidence on this point. Similarly, there was no particularized evidence regarding the physical characteristics of the other two persons in the room.

**5.** Before asking the defendant any questions Detective Gary gave him the warnings mandated by the Supreme Court in Miranda v. United States, 384 U.S. 436, 478–479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Detective read these warnings from a printed card used regularly by the Philadelphia Police Department, a sample of which was introduced into evidence at the hearing. On the face of the card there are a number of warnings intended to inform a suspect of his legal rights, and on the opposite side of the card there are seven questions. The evidence indicates that the police were careful to warn the defendant of all his rights, and that the latter at that time reflected a full awareness of these rights. N.T. pp. 242–245. There is no issue of waiver, here, however, for the evidence clearly indicates that the police advised the defendant in this manner only after the time of the allegedly improper occurrences.

rant was based upon the witnesses' identification of the defendant. N.T. pp. 39, 43–44.[6] Busch served the warrant at approximately 11:25 P.M. and at that time he seized from the defendant's premises the following articles: a sawed-off shotgun, two shotgun shells, a pair of sunglasses, adhesive tape, handcuffs with a key inserted in them, brown manilla paper, and miscellaneous papers including a probation card made out in the defendant's name. N.T. pp. 19, 46–47.

Finally, several weeks after the date of the robbery, the police asked Vaccaro, who had left the police station on the night of June 29th before any of the witnesses had looked into the detention room, to come to the West Detective Division to identify some money purportedly associated with the Post Office robbery. N.T. p. 385. At that time the police asked Vaccaro to walk by a cell in the station-house. N.T. pp. 385, 390–391. The evidence indicates that at that time Vaccaro observed the defendant confined in one of these cells and identified him as the robber. N.T. pp. 390–391.

## I

The defendant relates each of his motions to suppress to several allegedly improper police procedures which took place during the early stages of the government's proceedings against him which are described above. His contentions, and the Court's disposition of them, may be understood best by chronologically outlining the alleged improprieties.

The defendant's initial contention is that his arrest was illegal. He argues that the arrest warrant obtained by Detective Busch was defective because Busch presented the magistrate with no factual information upon which the latter independently could have determined whether or not there was probable cause for the arrest. See, *Aguilar*, supra, 378 U.S. at p. 114, 84 S.Ct. 1509. The defendant maintains that, because his arrest was made subsequent to the time when the allegedly defective warrant was issued, it can not be considered as a valid arrest without a warrant based upon probable cause. Instead, he argues that if the warrant was defective the arrest itself must also be defective.[7] He concludes, therefore, that all evidence produced as a result of this allegedly illegal arrest, including the evidence taken from his person and the material evidence later produced by the search, must be suppressed as " * * * fruits of the forbidden tree". See, Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Moreover, he contends that the alleged illegality of his arrest independently taints all identification testimony which could be offered at trial by the five witnesses who observed him at the West Detective Division because the opportunity for their identification resulted directly from that illegal arrest.

Secondly, the defendant contends that the police acted improperly in presenting photographs of suspects to the prospective identification witnesses. He argues both that counsel should have been present at this time and that the totality of circumstances at this time were " * * * unnecessarily suggestive and conducive to an irreparable mistaken identification". The defendant therefore concludes that testimony at trial relating to the photographic identification must be barred. See, Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, (1968), and Stovall v. Denno, 388 U.S. 293, 301–303, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Moreover, he contends that any other identification

---

6. A copy of the search warrant was introduced into evidence at the hearing. Under a sub-section entitled "Probable Cause and/or Reasonable Grounds" the warrant reads, in pertinent part, " * * * inside W.D.D. several employees of that Post Office did identify Cassino CLARK

(sic) as the man who held up and robbed them."

7. The defendant also has contended generally that his arrest, even if considered properly as an arrest without a warrant, was illegal because not based upon probable cause.

testimony at trial by those witnesses to whom the photographs were shown must be barred because such testimony would not be " * * * based upon observations of the suspect other than the (allegedly tainted photographic) * * * identification." See, United States v. Wade, 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967), *Simmons*, supra, and *Stovall*, supra. Finally, he maintains that the illegal arrest also vitiates the search, because the warrant authorizing that search was based upon identifications improperly elicited at the photographic display, and that, therefore, all material evidence produced by the search must be suppressed.

Thirdly, the defendant contends that the police acted improperly in permitting the prospective witnesses to observe him while he was in the detention room. He argues that this procedure constituted the type of pre-trial confrontation which the Supreme Court in *Wade* held could not be conducted in the absence of counsel. He therefore maintains that testimony relating to this confrontation must be barred. See, Gilbert v. State of California, 388 U.S. 263, 273–274, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) and, also, that any in-court identification by the witnesses who observed him in the detention room must be barred because such testimony would not have an " * * * independent source * * *" See, *Gilbert*, supra, 388 U.S. at p. 272, 87 S.Ct. 1951 and *Wade*, supra, 388 U.S. at pp. 240–242, 87 S.Ct. 1926. Finally, he maintains that this illegal viewing of his person independently destroys the foundation of the search because the warrant authorizing the search was based upon it.

Fourth the defendant contends that it was improper for the police to permit the four prospective witnesses who had remained at the police station to observe him being led away from the detention room in the custody of the police. By reasoning similar to that outlined above, he argues that this conduct must result in the suppression at trial of all identification testimony relating to this event, at least, by these four witnesses.

Finally, the defendant contends that it was improper for the police to take the witness James Vaccaro to the police station several weeks after his arrest and to permit him to observe the defendant while the latter was detained there in a cell. He argues that this procedure was " * * * unnecessarily suggestive and conducive to irreparable mistaken identification " * * *" and that, therefore, any testimony by Vaccaro which relates to this occurrence must be barred at trial. See, Stovall, supra, 388 U.S. at pp. 301–303, 87 S.Ct. at p. 1967. He contends also that all other in-court identification testimony by Vaccaro must be barred at trial because it would be testimony tainted by this improper procedure. See, *Wade*, supra, 388 U.S. at p. 240, 87 S.Ct. 1926.

The government has opposed both of defendant's motions. It contends initially that the defendant's arrest was proper because the arresting officers, armed with the knowledge conveyed to their direct superiors by the informer, had probable cause to believe that the defendant had committed the Post Office robbery. Conceding that the warrant itself might have been invalid, the government argues that this does not destroy the legality of the separate procedures actually employed in bringing the defendant into custody.

Secondly, the government contends that neither the display of the photographs nor the observation of the defendant in the detention room at the West Detective Division occurred at a critical stage of the prosecution requiring the presence of defense counsel. It contends also that neither of these procedures were conducted in an " * * * impermissibly suggestive * * *" fashion which would require the barring at trial of any related identification testimony. Conceding that either of these procedures might have been improper, however, the government argues that in-court identification testimony by these witnesses still should be admissible at

trial because such testimony would be based upon untainted observations of the defendant. See, *Wade,* supra, 388 U.S. at pp. 240–241, 87 S.Ct. 1926.

Some time after the argument of the defendant's motions the government informed the Court that it was withdrawing as witnesses at the trial two of the five Post Office employees, i. e. Edmond L. Lederer and James J. Vaccaro. Accordingly, the Court does not have to resolve those contentions of the defendant which relate to the proposed testimony by those two witnesses. For reasons discussed in detail below, the Court has reached the following decisions as to the defendant's other contentions:

1) The defendant's motion to suppress testimony at trial by the three Post Office employees relating directly to the two separate confrontations at the West Detective Division between the defendant and one or more of these witnesses in the absence of defense counsel must be granted;

2) The defendant's motion to suppress all identification testimony at trial by these three witnesses must be denied to the extent that these witnesses will be permitted to testify about the photographic display and about occurrences at the time of the robbery, and will be permitted to make in-court identifications of the defendant; and,

3) The defendant's motion to suppress material evidence taken from his person and from his residence must be denied in its entirety.

It should be emphasized that in denying portions of the defendant's motions to suppress the Court presently holds only that certain challenged police procedures were not constitutionally defective. Although testimony and evidence relating to and/or produced by those procedures therefore may be admissible as a constitutional matter, the trial court must still rule on whether part or all of this evidence should be admissible at trial as an evidentiary matter. For example, there is precedent which bars testimony at trial about previous out-of-

court identification, such as testimony here relating to the witnesses' identification of the defendant in the police-station, on the basis that such testimony is hearsay. See, United States v. DeSisto, 329 F.2d 929, 932–934 (C.A. 2, 1964), and 71 A.L.R.2d 442 et seq. There also is precedent which holds that it is improper to admit on direct examination photographs which police have presented prior to the trial to the government witnesses. See, United States v. Reed, 376 F.2d 226, 228 f.n. 2 (C.A. 7, 1967). Finally, the trial court must decide whether the prejudice to the defendant possibly produced by the introduction at trial of certain of the material evidence, e. g. the probation card made out in his name, exceeds the probative value of that evidence.

## II

The defendant's contention that his arrest was illegal is based primarily upon his assertion that, although the arrest itself might have been proper if no warrant had been obtained, since it was made pursuant to an illegal warrant it therefore was unlawful. An initial difficulty with this proposition is that the evidence suggests that the arrest in fact was not made "pursuant" to the arrest warrant, but that, instead, Captain Sambor ordered the arrest because of his knowledge of the informer's report and the laboratory findings with respect to the palm prints. Assuming, however, that the arrest was made pursuant to the warrant, at least in the sense that the arrest followed the issuance of the warrant, and assuming also that the warrant was defective under *Aguilar,* supra, the defendant's contention still must be rejected.

■ The law is clear that an arrest is lawful despite the fact that the arresting officers apparently relied upon an invalid arrest warrant *if* the " * * * officers had adequate knowledge independent of the warrant to constitute probable cause * * * " United States v. White, 342 F.2d 379, 381 (C.A. 4, 1965). In other words, a valid arrest

will not be invalidated merely because the arresting officers possessed an invalid warrant at the time when they effected the arrest. See generally, Giordenello v. United States, 357 U.S. 480, 485–488, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), Stallings v. Splain, 253 U.S. 339, 40 S.Ct. 537, 64 L.Ed. 940 (1920), United States v. Hall, 348 F.2d 837, 841 (C.A. 2, 1965), Willis v. United States, 106 U.S App.D.C. 211, 271 F.2d 477, 478 (1959), and Hagans v. United States, 315 F.2d 67, 69 (C.A. 5, 1963).

In determining whether the defendant's arrest, considered as an arrest without a warrant, was lawful, the Court must decide whether the arrest was "reasonable" within the context of the 4th Amendment of the Constitution which protects persons against unreasonable arrests, i. e., "seizures", as well as against unreasonable searches:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." See, the Fourth Amendment.

See also generally, *Giordenello*, supra, 357 U.S. at pp. 485–486, 78 S.Ct. 1245. An arrest will be considered constitutional only if it is based upon probable cause which is held to exist,

> " * * * where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949), quoting from Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

For reasons discussed below the Court has concluded that the defendant's arrest was based on probable cause, and, accordingly, the question concerning the validity of the arrest warrant is irrelevant.

■ The defendant initially argues that his arrest was not based upon probable cause because the arresting officers did not obtain a valid arrest warrant when it obviously was practicable for them to have done so. It is true that a search without a search warrant ordinarily is not deemed to satisfy the standards of the Fourth Amendment. See, Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145 (1925), and Jones v. United States, 357 U.S. 493, 497–498, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). Because of the important policy considerations in this area of the law courts generally have insisted that a search be preceded by " * * * the informed and deliberate determination of magistrates * * * ":

> "Security against unlawful searches is more likely to be attained by resort to search warrants than by reliance upon the caution and sagacity of petty officers while acting under the excitement that attends the capture of persons accused of crime." See, United States v. Lefkowitz, 285 U.S. 452, 464, 52 S.Ct. 420, 423, 76 L.Ed. 877 (1932).

The interests deemed to require the issuance of a warrant before a search are not controlling in the area of arrest. Here courts often have held that a warrant was not required for an arrest *in a public place, even though it may have been practicable to obtain a warrant,* if there was probable cause for that arrest. See generally, Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), Ford v. United States, 122 U.S. App.D.C. 259, 352 F.2d 927, 929–932 (C.A.D.C., 1965), and Hagan v. United States, 124 U.S.App.D.C. 276, 364 F.2d 669, 672 (C.A.D.C., 1966), cert. den. 386 U.S. 945, 87 S.Ct. 979, 17 L.Ed. 2d 875. In fact the Court in *Ford,* supra, 352 F.2d at p. 929, notes that:

> "We find no case holding that a warrantless arrest in a *public place* for a

felony, supported by probable cause, offends the standard of validity prescribed by the Fourth Amendment." (Emphasis supplied.)[8]

The defendant has argued that this precedent should not be controlling in this case because the arresting officers here clearly had time to get a warrant and, therefore, to uphold this arrest without a warrant is to permit a significant erosion of the Fourth Amendment by removing " * * * practically all incentive for officers to resort to a magistrate before making an arrest * * * " Moore, Federal Practice, Volume 8, ¶ 4.-02, p. 4–8. Initially, it must be emphasized that to the extent that no arrests are considered legal unless they are based on probable cause and unless they are made in a reasonable manner and for reasonable purposes the most important constitutional rights protected by the Fourth Amendment are maintained even in those cases where courts uphold arrests made without a warrant.[9] Moreover, by holding this arrest, which occurred on a public highway while the defendant was in a moving automobile, lawful because based on probable cause, the Court does not suggest that an arrest without a warrant would be permissible in other circumstances.

The Supreme Court recently has explained that the Fourth Amendment protects individuals from a full panoply of forms of police interference:

"It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. State of Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

As demonstrated in *Terry* itself, however, there is a hierarchy of these forms of interference and the constitutional standard with which police must comply varies in relation to the type of arrest they are making.[10] For example, the Court which upheld the warrantless arrest in *Ford*, supra, emphasized that:

" * * * (S)earch of a home or of occupied premises apart from an arrest or * * * search of a home intermingled with an arrest * * * (are) situations (which) raise different questions from those involved in an arrest alone." *Ford*, supra, 352 F.2d at p. 930.

It clearly is appropriate to require that these types of arrest which involve very substantial infringements of a person's liberty be made with a warrant, or, at least, that there be a more substantial showing of probable cause for such an arrest if made without a warrant than for the same type of arrest if made with a warrant. See, *Ford*, supra, 352 F.2d at 933.[11a] On the other hand, the Supreme

---

8. Other cases upholding a warrantless arrest based upon probable cause despite the fact that it would have been practicable for the arresting officers to procure a warrant include: Dailey v. United States, 261 F.2d 870, 872 (C.A. 5, 1958), cert. den. 359 U.S. 969, 79 S.Ct. 881, 3 L.Ed.2d 836, Abramson v. United States, 326 F.2d 565, 567 (C.A.5, 1964), and United States v. Hall, 348 F.2d 837, 841–842 (C.A.2, 1965).

9. Similarly, in those cases where arrests are held lawful despite the fact that they were made pursuant to invalid arrest warrants, see supra, pps. 616, 617, the arrests are held lawful *only* if they are based on probable cause and if they are made in a reasonable manner and for reasonable purposes.

10. Historical arguments have been advanced to explain this heirarchy: "It is interesting to note in passing that the Fourth Amendment does not use the word 'arrest.' The Framers were primarily concerned with the security of persons, houses, papers and effects from searches, and seizures resulting from searches. This appears from the language of the Amendment. The main thrust was directed at the invasion of privacy through general warrants of assistance and *lettress de cachet* * * *," *Ford*, supra, 352 F.2d at p. 932 (Citations omitted). See also generally, *Hall*, supra, 348 F.2d at pp. 841–842, and 52 Virginia Law Review 135, 139 (1966).

11a. No court has explained how application of the standard of probable cause would vary between the two types of situations. The Supreme Court has said only that the standard for an arrest without a warrant must be at least as

Court in *Terry*, supra, held a "stop and frisk" constitutional despite the fact that the arresting officer there did not even attempt to get a warrant.

■ The defendant's arrest here lies somewhere between the extremes of the hierarchy represented by the arrests discussed in *Ford* and involved in *Terry*. In view of the interest in permitting the police the flexibility to perform their duties in these types of difficult situations and in view of the precedent cited supra, p. 617, upholding similar arrests, the Court must conclude that the failure of the police here to obtain a valid arrest warrant does not invalidate this defendant's arrest if the arrest otherwise was based on probable cause.[11b] An examination of the facts indicates that there was probable cause for the defendant's arrest.[12]

■ It admittedly would be difficult to conclude that this arrest was lawful because based on probable cause if the arrest had been based solely upon the information forwarded to the police by the unidentified informer. The arrest, however, was based also upon an unequivocally positive laboratory determination that the defendant's palm prints were identical with those found upon the Post Office counter. N.T. pp. 25, 75. This combination of factors, plus the fact that the car in which the defendant was reported to be riding committed two traffic violations and attempted to evade the police car, clearly constituted probable cause for the defendant's arrest.[13]

---

high as the standard for an arrest on a warrant. See, *Wong Sun*, supra, 371 U.S. at pp. 479–480, 83 S.Ct. 407, and *Terry*, supra, 88 S.Ct. at p. 1887 (Dissenting Opinion, Douglas, J.).

**11b.** It should be noted that the defendant also has argued that arrests without warrants should not be permitted in those situations where the police could have procured a warrant because such arrests infringe a lesser constitutional interest of persons to be informed why they are being arrested. He maintains that here even though the police did get a warrant the arresting officers did not have it in their possession at the time of the arrest, and, accordingly, the defendant was not informed why he was being arrested. Although the Court agrees that the Fourth Amendment does protect an interest similar to that which the defendant advances, it is clear that protection of this lesser interest must vary with the type of arrest involved, and that in cases where police are merely stopping an individual or arresting him in a public place, this interest must be sacrificed to the interest of expediting police work.

**12.** Before examining the facts surrounding the defendant's arrest the Court had to resolve two preliminary matters. First it was determined that the arresting officers, who were state officials, were acting within their authority in making an arrest without a warrant because Pennsylvania authorizes such an arrest when the officer has reasonable and proper cause to believe that the person arrested has committed a felony. See, E.g., Commonwealth ex rel. Walls v. Maroney, 416 Pa. 290, 298, 205 A.2d 862 (1965). (The law clearly requires this Court to make such a determination when the arresting officers are state officials and there is no applicable federal statute authorizing them to make an arrest. See, United States v. Di Re, 332 U.S. 581, 589, 68 S. Ct. 222, 92 L.Ed. 210 (1948), and Miller v. United States, 357 U.S. 301, 305, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).) Secondly, it was determined that the arrest was consistent with Pennsylvania's substantive law at least to the extent that that law might establish more stringent standards for measuring probable cause than does the Constitution. See, Ker v. State of California, 374 U.S. 23, at p. 37, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

**13.** It is clear that flight from police in and of itself is not sufficient evidence to constitute probable cause for an arrest. See, *Wong Sun*, supra, 371 U.S. at p. 483, f. n. 10, 83 S.Ct. 407, and United States v. Margeson, 259 F.Supp. 256, 265 (E.D.Pa., 1966). Moreover, in certain circumstances it would be unreasonable to make any inference of guilt from the fact of flight. See, *Miller*, supra, 357 U.S. at p. 311, 78 S.Ct. 1190. On the other hand, flight of the defendant is evidence which should be coupled with other relevant factors in resolving whether the evidence in its totality was sufficient to establish probable cause. See, Peters v. State of New York, 392 U.S. 40, 88 S.Ct. 1889, 1912, 20 L.Ed.2d 917 (Opinion filed June 10, 1968), Adams v. United States, 118 U.S.App.D.C. 364, 336 F.2d 752,

This conclusion is not altered either by the fact that the officers ordering the arrest based this order upon hearsay information, see, Draper, supra, 358 U.S. at pp. 311–312, 79 S.Ct. 329, or by the fact that the arresting officers had no personal knowledge of any of the information upon which the arrest was based. See, United States v. Pitt, 382 F.2d 322, 324–325 (C.A. 4, 1967).[14] Moreover, to insist that the police officers should have delayed making this arrest until they personally had more substantial incriminating proof would be to place severe restrictions upon their activities:

> "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part * * * The rule of probable cause is a practical, nontechnical conception * * * Requiring more would unduly hamper law enforcement." See, *Brinegar*, supra, 338 U.S. at p. 176, 69 S.Ct. at p. 1311.

Finally, to accept the defendant's contention here also would be particularly inappropriate because the facts indicate that the police did attempt to have their actions ratified by " * * * a neutral and detached magistrate * * * " See generally, Johnson v. United States, 333 U.S. 10, at p. 14, 68 S.Ct. 367, 92 L.Ed. 436. To hold this arrest unlawful merely because of Detective Busch's failure to elaborate formally the facts of the case would be to " * * * exalt form over substance."

 Since the defendant's arrest was legal the police were justified in conducting any reasonable search of the

defendant incidental to that arrest. See, Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). The search of the defendant which produced the key to his home and $287.00 in cash was neither so remote in time nor so remote in place from the arrest as not to be incidental to that arrest. See, *Preston*, ibid., 376 U.S. at pp. 367–368, 84 S.Ct. 881. Considering all the circumstances existing at that time the Court must conclude that this search was conducted in a reasonable manner and was reasonably limited in scope. See generally, United States v. Rabinowitz, 339 U.S. 56, 65–66, 70 S.Ct. 430, 94 L.Ed. 653 (1950). Accordingly, all material evidence obtained by the search is admissible at trial. For reasons discussed above any other portions of defendant's motions to suppress which are based upon his contention that his arrest was unlawful also must be denied.

### III

The defendant next contends that he was entitled to have had counsel present at the time at which the police displayed the six photographs, including his photograph, to the five employees from the Post Office. He argues that conducting this procedure in the absence of counsel was improper and that, therefore, *Wade* and *Gilbert* require the suppression of all identification testimony at trial by those witnesses to whom such photographs were shown.

In establishing a right to counsel at certain types of pre-trial confrontations the Supreme Court employed expansive language in both *Wade* and *Gilbert*. The Court, however, carefully distinguished pre-trial stages such as lineups and showups from other stages " * * *

---

(1964), cert. den. 379 U.S. 977, 85 S.Ct. 676, 13 L.Ed.2d 567 (1965), Monnette v. United States, 299 F.2d 847, 851 (C.A.5, 1962) ("Flight from law officers is evidence of guilt"), and United States v. Bostic, 251 F.Supp. 306, 308 (E.D.Pa., 1966) (" * * * flight or the attempt to flee remains as both a common sense and a legitimate legal ground for inferring guilt").

14. It is sufficient if the chain of information from its source to the arresting officers was constructed with " * * * reliable links." United States v. Dento, 382 F.2d 361, 364 (C.A.3, 1967) cert. den., 389 U.S. 944, 88 S.Ct. 307, 19 L.Ed.2d 299.

such as systematized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair, and the like.", See, *Wade*, supra, 388 U.S. at p. 227, 87 S.Ct. at p. 1932. The Court explained the distinction in this manner:

> "We think there are differences which preclude such stages being characterized as critical stages at which the accused has the right to the presence of his counsel. Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts. The denial of a right to have his counsel present at such analyses does not therefore violate the Sixth Amendment; they are not critical stages since there is minimal risk that his counsel's absence at such stages might derogate from his right to a fair trial." *Wade*, supra, 388 U.S. at pp. 227–228, 87 S.Ct. at pp. 1932–1933.

See also, 81 Harvard Law Review 181 (1967).

While it is true that photographic displays, such as the one challenged here, do present somewhat greater opportunities for prejudice than do the other types of pre-trial investigatory stages which the Supreme Court in *Wade* and *Gilbert* distinguished from confrontations, the dangers inherent in these procedures have been recognized by the Court which has developed a body of precedent which requires the suppression a trial of any identification testimony produced by " * * * unnecessarily suggestive * * * " pre-trial procedures such as photographic displays. See generally, *Simmons*, supra, 88 S.Ct. at pp. 969–973. Moreover, it is likely that if any form of prejudice taints this type of procedure it is prejudice which arises from the nature and/or type of photographs displayed. By using these photographs in his cross-examination of government witnesses, defense counsel easily can reveal such prejudice and thereby impugn the related identification testimony.[15]

■ Finally, a requirement that defense counsel be present at these procedures, which ordinarily occur in the very early stages of police investigation, would have the harmful effect of obstructing and delaying the police from performing their " * * * responsibility of apprehending criminals." See, Wise v. United States, 383 F.2d 206, 210 (C.A.D.C., 1967), and *Wade* supra, 388 U.S. at p. 237, 87 S.Ct. 1926. For all of these reasons the defendant's motions to suppress must be denied to the extent that they are based upon his argument that defense counsel was required to be present at the time the photographs were displayed.

Conceding arguendo that it was not improper per se for defense counsel to be absent from the photographic display, the defendant contends that the police

---

15. In *Simmons*, supra, pp. 971, 972, the Supreme Court did hold that Title 18 U.S.C. § 3500, the Jencks Act, did not require the District Court to grant the defendant's request that the government produce the photographs which had been shown to the identification witnesses prior to trial. The Court suggested, however, that it might be an abuse of discretion for a District Court to refuse such a request in a case where the photographs were readily available. The Court also suggested that the defendant successfully could have had the pictures produced prior to trial pursuant to Rule 16 of the Federal Rules of Criminal Procedure.

Clearly, the Court's tolerance of these preliminary identification procedures in the absence of counsel is based substantially upon its conviction that a defendant's rights can be safeguarded by meaningful cross-examination aided by the demonstration of the photographs actually used. If it becomes clear that the police customarily are unable to produce photographs displayed before trial to prospective witnesses the Court may find it necessary to extend the holdings of *Wade* and *Gilbert* to require the presence of counsel at such pre-trial stages.

conducted this procedure in a prejudicial manner " * * * unnecessarily suggestive and conducive to irreparable mistaken identification * * * ", and that, therefore, any identification testimony at trial by those witnesses who viewed the photographs would constitute a denial of his rights to due process of law under the Fifth Amendment of the Constitution. See, *Stovall* supra, 388 U.S. at p. 302, 87 S.Ct. at p. 1972, Simmons, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, and Palmer v. Peyton, 359 F.2d 199, 202 (C.A. 4, 1966). See generally also, Hanks v. United States, 388 F.2d 171, 174 (C.A. 10, 1968), United States v. Chibbaro, 361 F.2d 365, 376–377 (C.A. 3, 1966), and Wise v. United States, supra, 383 F.2d at pp. 209–210.

The facts in *Simmons*, supra, are similar to the facts here and, therefore, it is instructive to review in detail the Supreme Court's decision in that case. In *Simmons* the FBI agents had obtained a number of photographs picturing the defendant among a group of people and, on the day following the robbery, they had shown at least six of these pictures to five witnesses at the witnesses' place of work. Each of these witnesses was a bank employee who had witnessed the robbery which had taken place in the well-lighted bank during the afternoon. Each of them " * * * had been able to see the robber later identified as Simmons for periods ranging up to five minutes." See, *Simmons*, 88 S.Ct. at pp. 971, 972. The photographs were shown to each witness individually and there was " * * * no evidence to indicate

that the witnesses were told anything about the progress of the investigation, or that the FBI agents in any other way suggested which persons in the pictures were under suspicion." See, *Simmons*, supra, 88 S.Ct. at p. 972. Each witness identified Simmons and verified this identification in viewings conducted thereafter. The Court concluded that:

"* * * in the factual surroundings of this case the identification procedure used was not such as to deny Simmons due process of law or to call for reversal under our supervisory authority." See, *Simmons*, supra, 88 S. Ct. at 972.

■ The facts here are significantly similar to those in *Simmons* although they are perhaps even less favorable to the defendant's claims. The robbery here also was conducted in the afternoon, the robber wore no mask, and the witnesses were able to observe the robber for periods ranging from a half-minute to fifteen minutes in length. Moreover, each of the witnesses had described the robber in some detail to the police who arrived at the Post Office a short time after the robbery. The photographs were displayed to the witnesses the *same evening* and, as in *Simmons*, each witness individually examined the photographs and there was no evidence at the hearing that the officials supervising the display of photographs made any suggestive remarks.[16] Each witness identified the defendant's photographs, and, shortly thereafter, verified this identification by their observation of the defendant in the detention room.[17] Under these cir-

---

16. The evidence indicated that Harry White was already at the West Detective Division when the defendant was brought in and that, at that time, he identified the defendant as the robber. See, N.T. 129. There was no evidence that the police prompted this identification or made any other prejudicial comments, and thus this accident does not taint White's subsequent photographic identification. Moreover, *Wade* would not bar White's identification testimony on the basis of this incident alone because the incident represented the type of casual occurrence which unavoidably will occur in the course

of daily police work, and White's response was clearly of a spontaneous nature.

17. Although the Court has decided infra, p. 628, that testimony concerning the observation of the defendant in the detention room must be barred at trial, it has decided that this conclusion does not require the barring of testimony regarding the photographic identification which was based upon an independent "untainted" source. See infra, p. 630. This latter decision, i. e. that the observation of the defendant in the detention room did not taint the preceding photographic identi-

cumstances the Court must conclude that the police conducted this investigatory procedure in a completely proper and non-prejudicial fashion.

As a practical matter police must be permitted to show photographs of suspects to the witnesses of a crime in the early stages of the investigatory process. Although the Supreme Court detailed the possibilities of mistaken identification which are inherent in the process of identification by photograph, the Court also emphasized that:

> "* * * this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." See, *Simmons*, supra, 88 S.Ct. at p. 970.

This interest has been emphasized in different but related contexts:

> "Here were circumstances of fresh identification elements that if anything promote fairness, by assuring reliability, and are not inherently a denial of fairness * * * we do not consider a prompt identification of a suspect close to the time and place of an offense to diverge from the rudiments of fair play that govern the due balance of pertinent interests that suspects be treated fairly while the state pursues its responsiblity of apprehending criminals." *Wise*, supra, 383 F.2d at pp. 209–210.

For all the reasons discussed above the defendant's motions to suppress must be denied to the extent that they are based upon his contention that the police conducted the photographic display improperly.[18]

## IV

The defendant's contention that it was illegal to permit four witnesses to observe him in the detention room of the West Detective Division, and that all testimony related to this occurrence must be barred at trial, is based upon the Supreme Court's recent decisions in *Wade* and *Gilbert*.[19] Resolution of this

---

fication, is not inconsistent with the Court's conclusion here that the witnesses' immediate verification of their identification of the defendant's photograph, as reflected by their recognition of the defendant while he was in the detention room, is probative of the accuracy of that photographic identification. See, *Simmons*, supra, 88 S.Ct. at 972, f.n. 6.

18. The decision here, like the decisions elsewhere in this opinion that certain testimony is constitutionally admissible as evidence, does not mean that this testimony will be held admissible at trial as an evidentiary matter. See, supra, p. 616.

19. On June 12, 1967, the Supreme Court decided a third case related to *Wade* and *Gilbert*. In this case, Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Court held that "* * * *Wade* and *Gilbert* affect only those cases and all future cases which involve confrontations for identification purposes conducted in the absence of counsel *after this date*." *Stovall*, supra, 388 U.S. at p. 296, 87 S.Ct. at p. 1969. (Emphasis supplied). The uniform construction of this language has been that "* * * after this date * * *" means "* * *

a cutoff date for prospective application based on the date of the confrontation rather than the date of the case or trial * * *". See, Pearson v. United States, 389 F.2d 684, 687, f.n. 2 (C.A.5, 1968). Most cases reported since *Wade* and *Gilbert* which have involved confrontations of the type discussed in those cases have involved confrontations conducted prior to June 12, 1967, and, accordingly the only inquiry in those cases was whether the confrontation was "* * * unnecessarily suggestive and conducive to irreparable mistaken identification * * *." See, *Stovall*, supra, 388 U.S. at p. 302, 87 S.Ct. at p. 1972. Also see, E.g., Crume v. Beto, 383 F.2d 36, 38–41 (C.A.5, 1967), *Wise*, supra, 383 F.2d at p. 209, *Pearson*, supra, 389 F.2d at 687, United States v. Beard, 381 F.2d 325, 328 (C.A.6, 1967), United States v. Ball, 381 F.2d 702, 703 (C.A.6, 1967), and United States v. Myers, 381 F.2d 814, 816 (C.A.3, 1967). The challenged confrontation here occurred on June 29, 1967, and therefore *Wade* and *Gilbert* are relevant here. *Stovall's* significance to this case is limited to a consideration of the defendant's arguments concerning the photographic display. See supra, pp. 620–623.

contention thus depends upon an interpretation of those decisions and an application of the Supreme Court's language to this particular confrontation.

In *Wade*, supra, 388 U.S. at pp. 224–228, 87 S.Ct. 1926, the Supreme Court held that a pre-trial confrontation, such as a lineup or a showup, was a "critical" stage in the government's prosecution of a defendant and that, therefore, it was a violation of a defendant's right to assistance of counsel, preserved by the Sixth Amendment of the Constitution, to conduct such a confrontation in the absence of defense counsel. In *Gilbert*, supra, 388 U.S. at pp. 273–274, 87 S.Ct. at p. 1957 the Court made clear that testimony regarding the illegal confrontation itself must be barred at trial in all cases:

> "The State is therefore not entitled to an opportunity to show that that testimony had an independent source. Only a *per se* exclusionary rule as to such testimony can be an effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup. In the absence of legislative regulations adequate to avoid the hazards to a fair trial which inhere in lineups as presently conducted, the desirability of deterring the constitutionally objectionable practice must prevail over the undesirability of excluding relevant evidence. Cf. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. That conclusion is buttressed by the consideration that the witness' testimony of his lineup identification will enhance the impact of his in-court identification on the jury and seriously aggravate whatever derogation exists of the accused's right to a fair trial."

The Court, however, did hold that in-court identification, and other forms of identification testimony, such as testimony relating to incidents occurring prior to the tainted confrontation, would be admissible at trial if the government proved that such testimony was not the "fruit" of the illegal confrontation, but, instead, was produced from an independent, un-tainted source. See, *Wade*, supra, 388 U.S. at pp. 241–242, 87 S.Ct. 1926.

The government has argued that there are three significant distinctions between the *Wade* and *Gilbert* confrontations and the observation challenged here.

1. This observation was vastly different in character from those types of confrontations, i. e. lineups and showups, with which the Supreme Court was concerned;

2. Assuming that this observation constituted the type of confrontation contemplated by the Court in *Wade*, nevertheless it was not conducted in a manner unfair to the defendant nor did it take place at a "critical" stage of the proceedings; and,

3. Assuming that this confrontation did occur at a critical stage of the proceedings, counsel had not yet been appointed for the defendant, and, a decision that he should have been represented by counsel at this time would ignore the substantial countervailing interests favoring prompt identification and the general expedition of police work. See, *Wade*, supra, 388 U.S. at p. 237, 87 S.Ct. 1926.

For reasons discussed below the Court has concluded that the distinctions advanced by the government are not compelling and that decision of the defendant's motions to suppress, insofar as those motions are based upon the defendant's contentions regarding this confrontation, therefore must be guided by the Supreme Court's holdings in *Wade* and *Gilbert*.

The government has emphasized that both *Wade* and *Gilbert* involved police procedures which much more closely resembled the general conception of a lineup than does the observation which was conducted here. For example, in *Wade*, supra, 388 U.S. at p. 220, 87 S.Ct. 1926, the defendant actually was lined up with five or six other prisoners, all participants in the lineup wore strips of tape on their faces, as the robber allegedly had

done, and all participants were directed to say words allegedly uttered by the robber. Similarly, in *Gilbert*, supra, 388 U.S. at p. 270, and f. n. 2, 87 S.Ct. 1951, the record indicated that the lineup was conducted on a stage illuminated by bright lights before an audience of over 100 persons, and that each participant had been required to step forward, turn around, put on and take off clothing, answer certain questions, and repeat certain phrases.

Although the defendant here was seated in a room with five other similarly-dressed persons and was observed by onlookers who peered through a window in the door to that room, he was required neither to speak nor to move. In short, the defendant was not subjected to the ignominy which characterizes the usual lineup or confrontation. The Supreme Court's condemnation of these confrontations, however, did not primarily reflect concern for the damaged pride of lineup participants. Instead, the Court's decisions reflected a concern about the inherent unfairness of such procedures, a belief that these confrontations often result in misidentification, and, a conviction that the absence of defense counsel from such confrontations substantially would impede his ability to cross-examine in a meaningful fashion at trial, thus converting the trial into little more than an appeal from the lineup. See, *Wade*, supra, 388 U.S. at pp. 224–226, 87 S.Ct. 1926. Accordingly, those factual differences between this case and *Wade* and *Gilbert*

which the government advances have no real importance. The significant characteristic shared by the confrontations there, i. e. a live confrontation between witnesses and the defendant, is shared as well by the occurrence here whether that occurrence is called a lineup, show-up, or standup.[20]

Secondly, the government has urged that *Wade* and *Gilbert* are distinguishable from this case because the confrontation here occurred the same day as the robbery whereas the confrontations in those cases took place at a later stage in the prosecution, i. e. in *Wade* the lineup was conducted forty days after the defendant's arrest, several weeks after his indictment, and fifteen days after appointment of his lawyer, and in *Gilbert* the lineup was conducted sixteen days after his indictment and after appointment of counsel. The government makes the related claim that the circumstances surroundng the confrontation in *Wade* and *Gilbert* much more clearly reflected "(T)he potential for improper influence * * *" than did the circumstances surrounding this confrontation, i. e. in *Wade*, the witnesses saw the defendant in the custody of an officer prior to the lineup, and in *Gilbert* the witnesses " * * * in each other's presence, call(ed) out the numbers of men they could identify", in a procedure of " * * * wholesale identifications * * *" See, *Wade*, supra, 388 U.S. at p. 234, 87 S.Ct. [1926] at p. 1955.[21] The government advances

---

**20.** Research has revealed no case interpreting *Wade* and *Gilbert* which is relevant to this particular problem. The Supreme Court did use certain language in those opinions, however, which supports the conclusion that these decisions were intended to extend to all types of confrontations: " * * * the confrontation compelled by the State between the accused and the victim or witnesses to a crime * * *", *Wade*, supra, 388 U.S. at p. 228, 87 S.Ct. at p. 1933; and, "The rule applies to any lineup, to any other techniques employed to produce an identification and *a fortiori* to a face-to-face encounter between the wit-

ness and the suspect alone * * *", *Wade*, supra, 388 U.S. at p. 251, 87 S.Ct. at p. 1944. (Dissenting Opinion, White, J.). As discussed supra, pps. 620–623, however, certain forms of investigation " * * * employed to produce an identification * * *", other than "confrontations", do seem to be beyond the scope of *Wade*.

**21.** The circumstances of the confrontation in *Stovall*, supra, i. e. a singular confrontation between the defendant who was handcuffed to a policeman and the victim who was hospitalized, also reflected clearly this "potential for improper influence."

both of these arguments in support of its contention that the confrontation conducted here, unlike the confrontations in *Wade* and *Gilbert*, was not conducted in a manner prejudicial to the defendant, and that, therefore, those Supreme Court decisions are inapplicable here.

The immediacy of the confrontation which the police conducted here probably would assure accurate identification testimony at trial by these witnesses and thus would result in a trial more fair to the defendant than was the trial in either *Wade* or *Gilbert*. Moreover, the evidence indicated that only one of the witnesses, Harry White, had seen the defendant in the custody of an officer prior to the detention-room observation,[22] and that each witness individually, and without any discussion with the other witnesses, identified the defendant. On the other hand, other evidence indicated that certain features of this confrontation were highly suggestive, e. g. there were significant differences in appearance among the six men who occupied the detention room. See, supra, p. 622, footnote 4.

Regardless of the relative merit of any of these distinctions which the government advances the Court still must reject its basic argument that the fairness of a confrontation can insulate it from the *Wade* and *Gilbert* holdings. This is so because the Court was so concerned with the prejudice to the defendant potentially inherent in all such procedures that it held that fairness to the defendant effectively could be insured only by a uniform rule requiring the presence of counsel at any confrontation which occurred at a "critical" stage of the prosecution. Therefore, a trial court reviewing a challenged pre-trial confrontation is not to inquire whether that confrontation was conducted in a fair or unfair manner, but rather, is to inquire only whether that confrontation occurred at a "critical" stage of the prosecution. If so, regardless of the demonstrated fairness of the confrontation, if defense counsel was not present at the confrontation identification testimony which is the fruit of that confrontation must be barred at trial.[23] Limiting the trial court's inquiry in this fashion reflected the Court's belief that even if a particular confrontation was in fact fair the absence of counsel from that confrontation at least in theory might hamper cross-examination and, therefore, deprive the defendant of his right to a fair trial.[24]

In the present case it is clear the government's prosecution of the defendant had reached a "critical" stage at the time when the five employees observed the defendant in the detention room. The government has argued strongly that this confrontation did not occur at a critical stage because the defendant had not yet been indicted. But, since the Supreme Court's oft-cited decision in Powell v. State of Alabama, 287 U.S. 45, 57,

---

22. The Court's decision that this episode was not prejudicial per se and not covered by *Wade* and *Gilbert* is explained supra, p. 622, footnote 16.

23. The Court did suggest that "Legislative or other regulations * * * which eliminate the risks of abuse and unintentional suggestion at lineup proceedings and the impediments to meaningful confrontation at trial may also remove the basis for regarding the stage as 'critical.'" *Wade*, supra, 388 U.S. at p. 239, 87 S.Ct. at p. 1938. The precise thrust of this suggestion is not clear. See, *Wade*, supra, 388 U.S. at p. 246, 87 S.Ct. 1926. (Dissenting Opinion, Black, J.). It is clear, however, that the Court did not contemplate the institutionalization of a procedure through which trial courts reviewed individual cases for "risks of abuse" as a suitable substitute for the presence of defense counsel.

24. By defining the scope of the trial court's inquiry on motions to suppress in this fashion the Court also sensibly restricted the length of the necessary evidentiary hearing. Of course the typical hearing will still be rather extensive, i. e. basic evidence must be adduced to aid the court in determining whether the confrontation occurred at a "critical" stage, and, if so, more factual evidence will be adduced by the government in attempting to prove that proffered identification testimony is from an "independent source".

53 S.Ct. 55, 59, 77 L.Ed. 158 (1932), emphasizing the importance of the right to counsel " * * * during perhaps the *most* critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial * * *", courts have recognized that pre-trial stages other than indictment are "critical", if the absence of counsel from such stages would derogate substantially from the defendant's rights under the Sixth Amendment. See E. g., Hamilton v. State of Alabama, 368 U.S. 52, 54, 82 S.Ct. 157, 159, 7 L.Ed.2d 114 (1961) (the arraignment here was considered "critical" because " * * * (w)hat happens there may affect the whole trial * * * (a)vailable defenses may be irretrievably lost * * * "), Escobedo v. State of Illinois, 378 U.S. 478, 487–491, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) (interrogation of a suspect in police custody is a critical stage).

The test used today for determining when the government's prosecution has reached a "critical" stage is a functional test, as stated in *Wade* itself, supra, 388 U.S. at p. 226, 87 S.Ct. at p. 1932:

" * * * where counsel's absence might derogate from the accused's right to a fair trial * * *",

and at p. 224, 87 S.Ct. at p. 1935,

" * * * (those) pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality."

The evidence here indicates that when the defendant was placed in the detention room " * * * the investigation (was) * * * no longer a general inquiry into an unsolved crime but * * * (had) begun to focus on a particular suspect * * * ", See, *Escobedo*, supra, 378 at p. 490, 84 S.Ct. at p. 1765. In fact there was evidence that the officers present at the time of the confrontation considered the defendant to be a "prime suspect". N.T. p. 140. It is also clear that the fact that the police swiftly apprehended the defendant, and therefore conducted this confrontation in the very early stages of their investigation of this crime, does not diminish at all the significant impact which this confrontation might have upon the defendant's fate. It must be concluded, therefore, that this confrontation occurred at a "critical" stage of the government's prosecution and that testimony at trial concerning this confrontation conducted in the absence of defense counsel would constitute a denial of this defendant's right to meaningful assistance of counsel. See *Wade*, supra, 388 U.S. at pp. 226–227, 87 S.Ct. 1926, and generally Pointer v. State of Texas, 380 U.S. 400, 406–407, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).[25]

Finally, the government has argued that *Wade* and *Gilbert* are distinguishable from this case because at the time

---

**25.** The Court's decision that this confrontation constituted a "critical" stage of the prosecution, even though it occurred at a very early step in the investigation of this crime, is opposed by a *reductio ad absurdum* argument that this decision means that any identification of a defendant by a victim or a witness to a crime, even if that identification occurs when the defendant is fleeing the scene of the crime, would be considered identification occurring at a critical stage of the prosecution. This is one of the fears of the dissenters in *Wade*, supra, 388 U.S. at p. 251, 87 S.Ct. 1926, and the Court lends support to such fears by stating that it will " * * * scrutinize *any* pretrial confrontation of the accused * * * ", p. 227, 87 S.Ct. at p. 1932. The Supreme Court's decision in *Es-*

cobedo, supra, and *Miranda*, have encountered similar arguments. Lower courts interpreting those decisions, however, have refused to apply them to situations where the police are in " * * * hot pursuit * * * " of the defendant. See, Kennedy v. United States, 122 U.S. App.D.C. 291, 353 F.2d 462, 465 (1965). A line similarly limiting the applicability of *Wade* and *Gilbert* would be consistent with these Supreme Court decisions. See generally, Commonwealth v. Bumpus, Mass., 238 N.E.2d 343. (Opinion filed June 14, 1968). Of course, police conduct during these stages of " * * * hot pursuit * * * " still could be subjected to scrutiny for alleged violations of a defendant's right to due process, under *Stovall*, supra, and its progeny. See, supra, p. 623, footnote 19.

of the confrontation here defense counsel had not yet been appointed, as was the case in *Wade* and *Gilbert*, and therefore a requirement that defense counsel should have been present at this confrontation would severely restrict police conduct. The Supreme Court acknowledged that its holdings might have this harmful result in certain cases. See, *Wade*, supra, 388 U.S. at p. 237, 87 S. Ct. 1926. The Court, however, did not suggest that this consideration alone, even in cases where there existed extraordinary circumstances which necessitated the speediest investigation, should out-weigh the defendant's constitutional right to have counsel present at a confrontation. Instead, the Court suggested that the problem could be ameliorated by provisions for substitute counsel at the police station and/or by "(l)egislative or other regulations, such as those of local police departments, which eliminate the risks of abuse * * *" See, *Wade*, supra, 388 U.S. at p. 239, and p. 237, 87 S.Ct. at p. 1938.

In fact this consideration is not too compelling in this case because the police already had arrested the defendant on probable cause and considered him to be a "prime suspect". It would not have proven costly or extremely time-consuming if the police, before permitting the witnesses to view the defendant, had warned the defendant of his rights pursuant to *Miranda*, supra, or had waited until defense counsel had been appointed.

### V

The defendant also has contended that it was improper for the police to permit the witnesses to observe him while he was being escorted from the detention room. For all the reasons discussed above the Court agrees that the logical thrust of *Wade* and *Gilbert* requires the suppression of any identification testimony at trial by these witnesses concerning this particular occurrence.

### VI

Finally, the defendant has contended that the police acted improperly by taking the prospective witness Vaccaro to the West Detective Division several weeks after the defendant's arrest and permitting him to observe and identify the defendant while the latter was imprisoned in a cell in that police-station. As noted supra, p. 616, the government has decided to withdraw Vaccaro as a witness at trial. Accordingly, this Court does not have to decide whether this confrontation was improper or whether testimony about the confrontation must be barred at trial.

### VII

The conclusions reached above that two confrontations conducted by the police, i. e. the observation of the defendant in the detention room and the observation of the defendant leaving the detention room were prohibited by *Wade* and *Gilbert* require the Court to exclude any testimony at trial directly concerning these confrontations. See, *Gilbert*, 388 U.S. at p. 273, 87 S.Ct. 1951. Hence, the Court must grant the defendant's motion to suppress insofar as that motion is directed to testimony by any prospective witnesses about either of those two confrontations.

As noted above at p. 624, however, the Supreme Court specifically ruled in *Wade*, supra, 388 U.S. at p. 240, 87 S.Ct. [1926] at p. 1939, that those witnesses who had been present at illegal confrontations would be permitted to testify to their identification of the defendant, by making in-court identifications for example, if " * * * the Government * * * establish(ed) by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." The Court suggested that the applicable standard for determining whether the Government had satisfied this burden was a standard established in Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963):

" * * * whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation

of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

The Court also suggested an alternative formulation of this rule as enunciated in Murphy et al. v. Waterfront Commission of New York Harbor, 378 U.S. 52, 79 f. n. 18, 84 S.Ct. 1594, 1609, 12 L.Ed. 2d 678 (1964):

> " * * * the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence."

At the hearing on defendant's motions to suppress, evidence was adduced to determine whether three types of identification testimony, i. e. testimony about the photographic display, testimony about identification of the defendant at the scene of the crime, and in-court identification, were arrived at by " * * means sufficiently distinguishable to be purged of the primary taint (of the illegal confrontations)", and had an " * * * independent legitimate source", and, therefore, should be admissible at trial. In analyzing this evidence the Court was guided by a consideration of various factors noted by the Court in *Wade,* supra, 388 U.S. at p. 241, 87 S.Ct. at p. 1940:

> " * * * the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification."

The initial inquiry at the hearing was whether any witness should be permitted to make in-court identification of the defendant and/or to testify about identification of the defendant at the scene of the crime. Evidence adduced at the hearing indicated that both forms of testimony should be permitted. It is clear that there had been no " * * * failure to identify the defendant on a prior occasion" nor " * * * any identification prior to lineup of another person * * ", and that each of the witnesses had participated in an " * * * identification by picture of the defendant prior to the lineup * * * " *Wade,* ibid, p. 241, 87 S.Ct. p. 1940. Moreover, the evidence indicated that each of the three witnesses Maddox, White and Brachman, at least, had had a significantly long " * * * opportunity to observe the alleged criminal act * * * " N. T. pp. 290–292, 315–317, 346, and 356–357.

 The evidence also indicated that each of these three witnesses accurately described the defendant to the police who arrived at the Post Office shortly after the robbery. N.T. pp. 19–20. Although it " * * * cannot be said with any certainty that they (the identification witnesses) would have recognized appellant at the time of trial if this intervening lineup had not occurred * * * ", Wade v. United States, 358 F.2d 557, 560 (C.A.5, 1960), this rigorous standard was rejected by the Supreme Court in *Wade,* supra, 388 U.S. at p. 242, 87 S.Ct. 1926, and application of the standards adopted by the Court requires the conclusion that it is constitutionally permissible for these three witnesses to make in-court identification of the defendant and to testify at trial about occurrences at the time of the robbery.[26]

---

**26.** The testimony of Lederer and Vaccaro indicated that application of the *Wong Sun* and *Murphy* standards might have required the Court to hold any identification testimony at trial by those two witnesses, including testimony relating to occurrences at the scene of the crime, impermissible because "tainted" by those witnesses' recollections of the improper confrontations. N.T. pp. 362–366, 381–383, and 399–401. If the government had not withdrawn these two individuals as witnesses the Court, therefore, might have had to resolve the question of what effect the recently-enacted Crime Control Act, Public Law 90–351, 90th Congress,

Secondly, evidence was adduced at the hearing to determine whether any of the witnesses should be permitted to testify at trial about identification of the defendant's photograph, or whether, instead, this testimony must be excluded because tainted by the prejudicial confrontations which followed the photographic display. The Court has concluded that all three witnesses, i. e. Maddox, White, and Brachman, may testify at trial about the photographic display.

The fact that the photographic display preceded the confrontations suggests generally that testimony about the display would be untainted. Moreover, although the confrontations might have crystallized the defendant's image in these witnesses' minds and thus served to taint all of their identification testimony, See, *Wade*, supra, 388 U.S. at p. 240, 87 S.Ct. 1926, the evidence indicated that all of the witnesses examined the photographs for a longer period of time than they had observed the defendant in the detention room. Finally, Maddox, White and Brachman each unequivocally identified the defendant's photograph when it was produced at the hearing.[27]

In summary, the Court has reached the following decisions on the defendant's motions to suppress:

(1) The defendant's motion to suppress testimony at trial by the three Post Office employees relating directly to the two separate confrontations at the West Detective Division between the defendant and one or more of these witnesses in the absence of defense counsel must be granted;

(2) The defendant's motion to suppress all identification testimony at trial by these three witnesses must be denied to the extent that these witnesses will be permitted to testify about the photographic display and about occurrences at the time of the robbery, and will be permitted to make in-court identifications of the defendant; and

(3) The defendant's motion to suppress material evidence taken from his person and from his residence must be denied in its entirety.

H.R. 5037, June 19, 1968, 82 Stat. 197, has upon the Supreme Court's decisions in *Wade* and *Gilbert*. The difficult constitutional issues involved in this inquiry have been avoided in this case by the government's withdrawal of these two witnesses.

27. In view of the determination that the confrontations did not taint any identification testimony it follows, a fortiori, that the confrontations did not taint the search of the defendant's residence and that, therefore, material evidence recovered by that search need not be suppressed at trial. Evidence adduced at the hearing indicated that the police had developed a strong case against the defendant prior to conducting the confrontations and that they would have procured the search warrant even if there had been no confrontation whatsoever. By permitting the witnesses to view the defendant the police intended only to confirm their suspicions and not to lay a foundation for the issuance of a search warrant. To suppress this material evidence would unfairly penalize conscientious police work."