**UNITED STATES of America,**
**Appellee,**

v.

**Dennis Richard HALL, Appellant.**

**No. 544, Docket 29196.**

United States Court of Appeals
Second Circuit.

Argued June 22, 1965.

Decided July 14, 1965.

Certiorari Denied Nov. 8, 1965.

See 86 S.Ct. 250.

1. *Collins v. Beto, Director*, D.C., 241 F.Supp. 170.

Louis A. Craco, New York City (Anthony F. Marra, The Legal Aid Society, New York City; Michael G. Marks, New York City, of counsel), for appellant.

Otto G. Obermaier, New York City (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, Andrew T. McEvoy, Jr., Asst. U. S. Atty., of counsel), for appellee.

Before MOORE and FRIENDLY, Circuit Judges, and WEINFELD, District Judge.*

FRIENDLY, Circuit Judge:

Appellant Dennis Richard Hall and one Gilbert Mellay were indicted in the Southern District of New York on three counts for transporting in interstate commerce securities known to have been stolen, converted or taken by fraud in violation of 18 U.S.C. § 2314 and on a fourth count for conspiring to commit

* Of the Southern District of New York, sitting by designation.

these offenses, 18 U.S.C. § 371. Mellay's case having been severed, Hall was tried before Judge Croake and a jury. He was found guilty on all counts and was sentenced to seven years imprisonment on the first three and five years on the fourth, the sentences to run concurrently. The evidence overwhelmingly justified the verdict; the points asserted on appeal concern the admission of statements and physical evidence allegedly resulting from unlawful arrest, unlawful detention and unlawful search and seizure.[1] We affirm.

The evidence demonstrated a bizarre fraud perpetrated by Hall and Mellay on an elderly lady of means. She was greatly interested in the World Calendar movement, which aims to promote peace by establishing a standardized calendar throughout the world. Using the name of George Jordan, Hall introduced himself to her in February, 1962, as the son of a professor at the American University in Beirut, Lebanon, who had come to express his father's thanks for her support of the movement. In March he sought and obtained $10,000 from her, allegedly for use in freeing a disciple of the movement imprisoned in Czechoslovakia. Shortly thereafter Mellay, posing as an art teacher interested in the movement, invited the lady to what proved to be an expensive dinner—for her—at the Tavern on the Green in Central Park. During the dinner Hall *alias* Jordan approached the table; the lady introduced him to Mellay. Hall expounded on the need for $200,000 to establish an organization for the promotion of the world calendar in the Near East. Mellay generously responded that he would provide half that sum if the lady would make a matching gift. After several telephone calls from Hall and Mellay, she withdrew $100,000 in State of Michigan bearer bonds from her account at the United States Trust Company on March 30, 1962, and delivered them to Hall at

La Guardia Airport. Subsequent efforts on her part to communicate with Hall having proved unavailing, her lawyer made a complaint to the New York office of the F.B.I.

After interviewing the victim of the fraud, Agent Nehrbass requested the F.B.I.'s Detroit office to inquire whether the Treasurer of Michigan knew of any recent transactions respecting the missing bonds. His diligence brought speedy fruits. On May 7 he was advised that in early April the Treasurer had registered $50,000 of the stolen bonds in the name of Joseph F. Lazzara of Spring Valley, N. Y., who had himself presented certain of them in Lansing and whose description tallied with that of Hall-Jordan, and at Lazzara's request had forwarded certain of the registered bonds to the Rockland National Bank in Spring Valley.

The F.B.I. acted promptly on the information thus obtained. Inquiry at the Rockland National Bank on the morning of May 8 disclosed that a Joseph F. Lazzara, whose description tallied with the victim's recollection of Hall, had sought to obtain a loan on the security of Michigan bonds in bearer form, and that the bank had refused but had referred him to a brokerage house in Spring Valley. Investigation there developed that Lazzara, representing himself as a new resident of Spring Valley, had sought to sell some of the bonds; that, on being informed that proof of ownership would be required, he said the bonds had long been in his family but proof of ownership might be difficult, and that, then or later, the manager had suggested registration. Inquiry at the main office of the brokerage house in New York indicated that Lazzara had also endeavored to sell the bearer bonds through them.

On the same day Agent Nehrbass swore out a complaint charging Hall with violation of 18 U.S.C. § 2314. The complaint did not present any of the damn-

---

1. A claim, asserted in Hall's brief, that his interrogation violated his right to counsel under an extended interpretation of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), was expressly withdrawn and accordingly need not be discussed.

ing evidence the F.B.I. had obtained; it said merely:

> "The bases for deponent's knowledge and for the foregoing charge are, in part, as follows: Investigation in the ordinary course of his duties."

Nehrbass and two other agents arrested Hall about 4 P.M. in his automobile on the Palisades Parkway near Spring Valley and searched his person and the car. Nehrbass testified that he told Hall that the latter did not have to talk to the agents, that anything he told them could be used against him in court, and that he had a right to an attorney. Over "a continuing objection" by Hall's retained trial counsel,[2] the agent recounted the following:

En route to the F.B.I. office in New York, to which Hall was being taken to be fingerprinted and photographed, Nehrbass asked where Hall had gotten the bonds he had transported to Michigan. At first Hall refused to tell; about five minutes later, he admitted having received the bonds from the wealthy lady but gave a false story as to their acquaintance. Nehrbass inquired as to the whereabouts of the $50,000 of bonds still unaccounted for; Hall replied that if the lady asked for them back, he would return them. Hall reached the F.B.I. office around 5:15 or 5:30 P.M.; the victim, promptly summoned, arrived around 7 P.M. She asked to have her bonds back and Hall said she would get them. Nehrbass inquired where the remaining bonds were; Hall said that they were secreted in Philadelphia and that he would have to make a number of telephone calls to locate them. Fearing that such calls might lead to disappearance of the bonds, the agent refused. Hall then said that the bonds were hidden in his garage in Spring Valley and that he wanted to tell his wife where the bonds were; Nehrbass declined permission, for the same reason. Hall changed his story again, "They are not in my garage. * * But if you will take me home I will show you where they are." This offer the agents accepted.

Agents Nehrbass and Ryan, along with Hall, reached his home in Spring Valley about 8:30 P.M. He told his wife, "I'm in trouble. I stole some bonds and I want to give them back to the F.B.I." Proceeding to the bedroom, Hall indicated to his wife that the bonds were hidden under some insulation in a crawl space under the roof that could be reached through a hole in the bedroom closet. Mrs. Hall went up through the hole, reached under the insulation, and extracted an envelope containing $50,000 of State of Michigan bonds. Hall sought and received permission to eat and say good-bye to his children; the party returned to the F.B.I. office about 10 or 10:30 P.M. Upon arrival Hall said, "I played the game and I lost and I'm ready to pay"; he asked whether he could plead guilty immediately so as to start on his sentence and said he would waive indictment. A statement was prepared which Hall read and signed about 11:30 P.M.[3] He left the F.B.I. office around midnight, was delivered to the Federal House of Detention twenty minutes later, and was brought before a Commissioner around noon on May 9.[4]

---

2. Presumably this referred back to a motion to suppress statements or evidence taken after the arrest on which decision had been reserved and which was renewed at the beginning of Nehrbass' testimony. The stated grounds were the illegality of the arrest and undue delay in preliminary examination.

3. The Government withdrew its offer of the statement, for reasons unconnected with the points here considered. Appellant's argument that, despite the withdrawal, the jury was permitted to learn that the statement existed and that Hall had admitted presence at the Tavern on the Green meeting, is sufficiently answered by the fact that what the jury learned was consistent with the theory of Hall's defense and was no more than it learned from otherwise competent admissions by Hall.

4. Before arraignment Hall was taken before an Assistant United States Attorney, avowedly for the purpose of discussing bail. However, no incriminatory statements during this interview were offered.

841

(1) Hall claims that the arrest was unlawful and that, under Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), all evidence resulting from it should have been suppressed. Conceding the invalidity of the arrest warrant, compare Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), the Government justifies the arrest as made on reasonable cause to believe that Hall had committed a felony. Conceding that such cause existed, Hall contends that this is not enough when the Government had time to obtain a warrant and that the existence of such time is conclusively demonstrated by its having done so—a fact which the Government has not contested.

■■ The argument would impose on the law of arrest a requirement thus far confined to the law of search and seizure. We see no occasion for doing so on the facts here. We accept that "The history and development of the Fourth Amendment show that it guarantees the right of the individual to be secure in his person against unreasonable arrests, as well as against unreasonable searches of houses and seizure of papers and effects," see United States ex rel. Potts v. Rabb, 141 F.2d 45, 46 n. 1 (3 Cir.), cert. denied, 322 U.S. 727, 64 S.Ct. 943, 88 L.Ed. 1563 (1944), and that it "protects against improper seizure of the person as fully as against unreasonable breaking into the close," Collins v. Beto, 348 F.2d 823, 832 (5 Cir. 1965) (concurring opinion). See also Giordenello v. United States, supra, 357 U.S. at 485–486, 78 S.Ct. 1245. Still it does not follow that the test of propriety with respect to the two subjects has been or should be precisely the same.

■ The Fourth Amendment must be construed in the light of its common-law background. Whereas search warrants were required save in exceptional cases, "all felony arrests, including those involving entry into houses, could be made without securing warrants. In fact, warrants were regarded with suspicion and their use recognized only reluctantly and for the primary purpose of protecting persons making arrests from tort liability." Barrett, Personal Rights, Property Rights and the Fourth Amendment, 1960 Supreme Court Review 46, 49–50, citing, inter alia, 1 Chitty, Criminal Law 15–26, 33, 51–59 (1816). One reason underlying the distinction may be that a person, save possibly when asleep at home during the night, always has the same potential mobility as do objects which are in a moving vehicle or, because of their small size and the proximity of someone with adequate motive, are in danger of being removed or destroyed, and are thus subject to search and seizure on probable cause without a search warrant. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Johnson v. United States, 333 U.S. 10, 14–15, 68 S.Ct. 367, 92 L.Ed. 436 (1948); Ker v. California, 374 U.S. 23, 42 n. 13, 83 S.Ct. 1623, 10 L.Ed. 726 (1963).

United States v. Rabinowitz, 339 U.S. 56, 60, 66, 70 S.Ct. 430, 94 L.Ed. 653 (1950), tends against Hall's contention, see Ker v. California, supra, 374 U.S. at 41–42, 83 S.Ct. 1622; and Giordenello v. United States, supra, 357 U.S. at 488, 78 S.Ct. at 1251, 2 L.Ed.2d 1503, left it open for the Government at a new trial to "seek to justify petitioner's arrest without relying on the warrant." Appellant's reliance on McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), and Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), is misplaced. In McDonald the Court invalidated the arrest, not because the police lacked a warrant but because of the improper manner in which they had acquired probable cause. Similarly, in Johnson, probable cause for the arrest was obtained only after an unauthorized invasion of the suspect's home; one can infer that, had it been otherwise, the arrest and incidental search would have been upheld. The Courts of Appeals that have been confronted with the contention under discussion, including our own, have declined to sustain it in circumstances like those here. Smith v. United States, 254 F.2d 751, 755–758 (D.C.Cir.), cert. denied, 357 U.S. 937,

78 S.Ct. 1388, 2 L.Ed.2d 1552 (1958); Dailey v. United States, 261 F.2d 870, 872 (5 Cir. 1958), cert. denied, 359 U.S. 969, 79 S.Ct. 881, 3 L.Ed.2d 836 (1959); Di Bella v. United States, 284 F.2d 897 (2 Cir. 1960), vacated on other grounds, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962);[5] United States v. White, 342 F.2d 379 (4 Cir. 1965). See also Barrett, supra, 1960 Supreme Court Review at 50; Leagre, The Fourth Amendment and the Law of Arrest, 54 J.Crim.L., C. & P.S. 393, 404–05 (1963); LaFave, Arrest 15–16 (1965). What the Supreme Court has characterized as "a grave constitutional question" with respect to an arrest without warrant where there was opportunity to secure one, Jones v. United States, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958), related not to an arrest on a public highway but to one accomplished by "forceful nighttime entry into a dwelling * * *"; such a case, unlike ours, comes close to what the Court has characterized as the "very core" of the Fourth Amendment, "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961).[6]

(2) Hall contends in the alternative that evidence obtained subsequent to his arrival at the F.B.I. headquarters should have been excluded under F.R.Cr.P. 5(a) as applied in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

■ There is no evidence that after Hall's arrival at F.B.I. headquarters and the completion of such preliminaries as fingerprinting and photographing, a Commissioner was still available to arraign him. However, Hall correctly notes our recent holding in United States v. Middleton, 344 F.2d 78, 82 (2 Cir. 1965), that although Rule 5(a) is not violated under such circumstances "by a delay for the purpose of arraigning the defendant before a Commissioner the next morning, United States v. Vita, 294 F.2d 524, 529 n. 1 (2 Cir. 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962); United States v. Ladson, 294 F.2d 535, 537 n. 1 (2 Cir. 1961), cert. denied, 369 U.S. 824, 82 S.Ct. 840, 7 L.Ed.2d 789 (1962), the unavailability of a Commissioner does not license the police to continue their interrogation through the night." Nevertheless his reliance on that decision is misplaced. A prime objective of the F.B.I.'s activity from the moment of arrest to Hall's return to its headquarters after the visit to Spring Valley was to recover the $50,000 of stolen bearer bonds. Delay for such a purpose is no more "unnecessary" than delay in an endeavor to ascertain the whereabouts of and to recover a kidnapped child; failure by the F.B.I. to make every proper effort to locate the bonds would have involved grave risk that Hall's confederate, alerted by his arrest, might make away with the remaining loot. The Middleton

---

5. Judge Waterman's dissent in Di Bella was directed not to the issue here under discussions but to the existence of probable cause and the permissible scope of the search.

6. We do not mean our decision that the arrest was lawful to imply that a contrary conclusion would necessarily require reversal. It is not clear that any articles seized from Hall's person or car at the point of arrest were allowed into evidence, so we are not dealing with an incidental search sustainable only if the arrest was proper. Rather, the material items introduced were oral statements voluntarily made by Hall on the trip back to New York and at headquarters and the bonds voluntarily relinquished by him at Spring Valley, and the argument must be that these were the "fruit" of the arrest under Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Whether Wong Sun goes further than to exclude statements shaken from the captive at the very point of arrest in the turmoil of the illegal invasion and their "fruits" is a mooted question that need not here be decided. See Rogers v. United States, 330 F.2d 535, 541 (5 Cir.), cert. denied, 379 U.S. 916, 85 S.Ct. 265, 3 L.Ed.2d 186 (1964); Collins v. Beto, supra, 348 F.2d at 823, 832 (concurring opinion).

opinion was carefully limited to its particular facts—"where the detention is unreasonable in length and its purpose is not investigatory, but to keep the accused in custody for an indefinite period until he confesses * * *." 344 F.2d at 83. Moreover, in Middleton the Court recognized the permissibility of detaining a suspect while exculpatory statements are investigated, 344 F.2d at 83, and indeed approved that portion of Middleton's interrogation which occurred between 5 and 7 p. m. since its purpose was investigatory. Cf. United States v. Coppola, 281 F.2d 340, 342–343 (2 Cir. 1960), aff'd, 365 U.S. 762, 81 S.Ct. 884, 6 L.Ed. 2d 79 (1961). Investigation was precisely the purpose of the detention here— indeed, investigation not to obtain evidence of Hall's guilt, of which there was already an abundance, but primarily to restore to the victim what he had feloniously taken from her. We cannot believe the Supreme Court ever meant F.R.Cr.P. 5(a) to thwart the police in fulfilling a function so basic to orderly society or to prevent the reception of evidence obtained by them in its pursuit. Hall's admission, on returning to F.B.I. headquarters, was spontaneous and immediate. Compare Mallory v. United States, supra, 354 U.S. at 454–455, 77 S.Ct. 1356, with United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944).[7]

(3) Hall's final contention, that the bonds found in his home were improperly received in evidence since the search was illegal, requires little discussion. It is doubtful that the point is open. When the bonds were offered, Hall's experienced trial counsel expressly stated "No objection," and under these circumstances the general "continuing objection" to the Agent's testimony would hardly apprise the judge that he did object to the introduction of this real evidence. Although the elimination of constant repetition of objections is desirable, we emphasize the need of clearly and distinctly alerting the trial judge, and opposing counsel, to every claim intended to be reserved for possible appeal. But in any event, and even if we assume in Hall's favor that the circumstances did not justify a warrantless search, we see not the slightest reason to doubt that the surrender of the bonds was voluntary. Shortly after his arrest, Hall offered to return them if their owner requested, and when she did, he acquiesced at once. Then, after a brief evasion, Hall told the agent, "if you take me home I will show you where they are." Whether Hall was cooperating in order to lay the groundwork for his trial defense that the bonds were obtained without fraud, or to spare his family the shock of a search of his house for which a warrant could surely have been obtained, or simply in order to mitigate punishment, can be debated, but the presence of affirmative consent is clear. United States v. Smith, 308 F.2d 657 (2 Cir. 1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed. 2d 716 (1963); United States v. Bracer, 342 F.2d 522 (2 Cir. 1965).

The court is indebted to Louis A. Craco, Esq., assigned counsel on appeal, for an effective brief and earnest argument on Hall's behalf.

Affirmed.

---

7. Greenwell v. United States, 336 F.2d 962, 964–965 (D.C.Cir.1964), pressed on us by appellant, could be distinguished because of the interrogation in the officers' parked car, which seems to have been directed solely to eliciting a confession, and, so far as concerns the physical evidence, by the involuntary nature of the journey to the parents' home. But we do not wish to be understood as indicating any views as to the result there reached. Cf. Metoyer v. United States, 102 U.S.App.D.C. 62, 250 F.2d 30 (D.C. Cir. 1957), and Heideman v. United States, 104 U.S.App.D.C. 128, 259 F.2d 943 (D.C.Cir. 1958), cert. denied, 359 U. S. 959, 79 S.Ct. 800, 3 L.Ed.2d 767 (1959). See Jones v. United States, 342 F.2d 863, 865 (D.C.Cir. 1964) (en banc).