**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Odell BROWARD and Gary L. Forbes, Defendants-Appellees.**

**No. 602, Docket 78–1409.**

United States Court of Appeals, Second Circuit.

Argued Jan. 22, 1979.

Decided March 9, 1979.

Certiorari Denied June 18, 1979. See 99 S.Ct. 2882.

---

Edward J. Wagner, Asst. U. S. Atty., Buffalo, N. Y. (Richard J. Arcara, U. S. Atty., Western District of New York, Buffalo, N. Y., of counsel), for plaintiff-appellant.

Mark J. Mahoney, Buffalo, N. Y. (Diebold, Bermingham, Gorman, Brown & Bridge, Buffalo, N. Y., of counsel), for defendant-appellee Broward.

Arthur F. Dobson, Buffalo, N. Y. (Parrino, Cooper, Butler & Dobson, Buffalo, N. Y., of counsel), for defendant-appellee Forbes.

Before LUMBARD, FEINBERG and MESKILL, Circuit Judges.

FEINBERG, Circuit Judge:

This is an appeal by the United States, pursuant to 18 U.S.C. § 3731, from an order of Judge John T. Elfvin of the United States District Court for the Western District of New York suppressing certain evidence and dismissing a five-count narcotics indictment. Appellees Broward and Forbes were charged with conspiring to distribute heroin, 21 U.S.C. §§ 841, 846; Forbes alone was charged with distributing and possessing both heroin and marihuana, 21 U.S.C. §§ 841, 844; and Broward was charged with aiding and abetting Forbes's distribution of heroin, 18 U.S.C. § 2. For the reasons stated below, we reverse the order of the district court and reinstate the indictment.

I

We begin by summarizing the facts, which, except where indicated, are those found by Judge Elfvin in his memorandum opinion that dismissed the indictment. Margaret Carriger, who had been acting as an FBI informant in Detroit for Special Agent Prillman, knew appellee Broward. Broward convinced Carriger to assist him in a narcotics deal. To that end, or so Broward thought, she met Broward at a hotel in Toronto. Prior to leaving Detroit, however, Carriger spoke with an officer of the Ontario Provincial Police (OPP), who had been contacted by Prillman. The OPP in turn informed the Royal·Canadian Mounted Police (RCMP), who have primary responsibility for drug investigations in Canada. The Canadian authorities secured an "observation room" at the Toronto hotel as well as wiretap authorization. Based on this surveillance, the OPP told Prillman that Carriger had met with Broward and discussed a narcotics transaction. Agent Gill of·the United States Drug Enforcement Agency (DEA), residing in Toronto, was contacted. He supplied the Canadian authorities with photographs of Broward obtained from DEA agents in Buffalo, New York, and was also present at various times in the "observation room."

Appellee Broward wanted Carriger's help in transporting heroin from Buffalo to Detroit and Los Angeles. He also threatened Carriger that he would find her wherever she went if anything went wrong, and Carriger feared for her life. There was testimony in the suppression hearing before Judge Elfvin that Broward said he would "[cut] her into little pieces and [flush] her down the toilet." Because of the risk to Carriger, both Prillman and the Canadian authorities agreed that she should be extricated from the situation.

The Canadian police learned from surreptitious conferences with Carriger that she was to purchase heroin from appellee Forbes in Buffalo. No criminal charges were laid in Canada, since no transactions were to occur there, and arrangements were made for Carriger to work with the DEA, who promised Prillman they would assure her safety. Carriger went to Buffalo where she was met by Forbes, who drove her to a Buffalo hotel. An attempt was

made to tail Forbes after he left the hotel, but he successfully used evasive driving tactics. DEA agent Peterson registered in the room next to Carriger's and made voice contact with her. Carriger told him Forbes would return soon. Forbes returned to Carriger's room and remained for forty-five minutes. After Forbes left, Peterson went to Carriger's room. She told Peterson that she had received $5,000 worth of heroin from Forbes, and that it was strapped to her body in plastic bags. She was then relieved of the heroin, whereupon she immediately left for Detroit and the protection of agent Prillman.

Buffalo DEA agents and an attorney from the United States Attorney's office determined that in seeking an arrest warrant for appellees Broward and Forbes, it was necessary to "cover up" Margaret Carriger's informant status in order to assure her safety. Thus, in the affidavit presented to the United States Magistrate, Margaret Carriger was characterized as a co-defendant and was referred to throughout as "Margaret Carcer," and a fictitious "reliable informant" was introduced into the narrative as the source of information that in fact came from Carriger.[1] The pertinent parts of the affidavit read as follows:

> On February 12, 1976, your deponent received information from Special Agent Frank Gill, Toronto DO, that Odell BROWARD would be traveling to Toronto, Ontario, Canada to meet with Margaret CARCER, and other unknown individuals to negotiate for the sale of a large quantity of heroin. On that date your deponent did verify that BROWARD travelled to Toronto via Allegheny Airlines.
>
> On February 13, 1976, Margaret CARCER arrived in Toronto, Ontario, from Detroit, Michigan.
>
> On February 13, 14, and 15, 1976, CARCER, BROWARD, and two other unidentified individuals met in CARCER'S room in the Four Seasons Sheraton, in downtown Toronto. The RCMP told your de-

ponent that during the course of these meetings, BROWARD told CARCER that she was to travel to Buffalo, New York and pick up a sample package. CARCER told BROWARD that she had customers in Detroit and California.

The RCMP told your deponent that on February 14, 1976, BROWARD contacted Gary FORBES in Buffalo, New York, and directed him to prepare a special sample for one. BROWARD further told FORBES that CARCER was negotiating for at least a hundred thousand dollars worth, and a special package of "pure" and a five thousand dollar package was needed for the customers in Detroit. Broward told FORBES that CARCER would be arriving in Buffalo, New York, on February 15, 1976 via Allegheny Flight # 804, which would arrive in Buffalo at about 1:59 PM and that he (FORBES) should pick up CARCER at the airport. BROWARD directed FORBES to rent a room at the Holiday Inn, Delaware Avenue, Buffalo, New York, and that the transaction would take place there.

Special Agent Kenneth B. Peterson told your deponent that on February 15, 1976, at about 1:55 PM, CARCER arrived at the Buffalo International Airport and was met by FORBES. FORBES AND CARCER were followed by agents of the Buffalo District Office, DEA, to the Holiday Inn, 620 Delaware Ave., Buffalo, New York.

At about 2:35 PM, Agent Peterson observed FORBES exit the Holiday INN, enter his vehicle and drive in a circuitous manner to the vicinity of Tupper and Franklin sts, Buffalo, where the surveillance was discontinued due to his extremely evasive driving techniques.

On February 16, 1976, your deponent was advised by Special Agent Peterson that CARCER had registered in Room 414 in the Holiday Inn.

---

1. Apparently, though we can only surmise, the intended effect of the affidavit was to fool appellees, if they found out about the affidavit, into thinking that the government agents hardly knew Margaret Carriger.

At about 4:15PM Forbes was observed arriving at the Holiday Inn carrying a dark colored briefcase, and enter CARCER'S room. At about 5:20PM, FORBES left the Holiday Inn, and drove in an evasive and circuitous manner to the parking lot of Audrey and Dell's Records, Walnut and Broadway, where he parked his vehicle and was observed entering 362 Broadway.

On February 16, 1976, your deponent was advised by Special Agent Randy Pillman, FBI, Detroit Office, that a reliable informant stated that he had seen Margaret CARCER on the evening of February 15, 1976, in Detroit, Michigan. This reliable informant told Agent Pillman that he had seen brown powder contained in two separate glassine envelopes and an additional two clear plastic bags containing brown powder, all taped to CARCER's body with brown tape. This informant told Agent Pillman that CARCER had stated that she had met and negotiated with Odell BROWARD in Toronto, Ontario, and had subsequently, on February 15, 1976, travelled to Buffalo, N.Y. at his (BROWARD's) direction and met with and obtained the heroin which was taped to her body from Gary FORBES.

The above reliable informant is considered reliable based on the following: information furnished by the informant to Agent Pillman has resulted in two active investigations by the FBI into program frauds in the Detroit area, and six active investigations into illegal gambling, extortion and prostitution in Detroit, Michigan and Los Angeles, California.

Arrest warrants were then obtained from the Magistrate for Broward, Forbes and "Carcer." There was a conflict in the testimony at the suppression hearing, however, as to whether the government agents disclosed to the Magistrate at that time that some of the material inserted in the affidavit was false, in order to protect Carriger. A DEA agent and a Buffalo Police Department detective testified that the Magistrate was informed in detail. The Magistrate testified, however, that while he had no specific recollection of whether he was so apprised or not, in response to a hypothetical question from Judge Elfvin, he stated quite positively that he would not have signed an arrest warrant based on intentional misstatements of fact. Judge Elfvin credited the Magistrate's testimony, and discredited that of the DEA agent and the Buffalo detective, and thus found as a fact that the Magistrate was not told of the partial falsifications in the affidavit.

Forbes was then arrested in front of his apartment building, and when he indicated that he wanted personally to tell his wife of the arrest, the DEA agents escorted him to his apartment. From the apartment doorway, the agents saw in plain view marihuana, hashish and a pipe. While two agents waited in the apartment the DEA agent and the Buffalo detective, whose testimony at the suppression hearing conflicted with the Magistrate's as just described, left to procure a search warrant. The affidavit for the search warrant recited that the DEA agent saw "marijuana, cutting and packaging material, all laying in plain view on the kitchen counter which is directly across from the entrance to the apartment." From the record, it appears that the execution of the search warrant led to the seizure of a quantity of heroin and marihuana, as well as various pieces of narcotics paraphernalia. It is this evidence that was ordered suppressed.

## II

In ruling that the evidence seized pursuant to the search warrant must be suppressed, Judge Elfvin held that admissibility of the evidence was " 'bootstrapped' to the legality of the arrest warrant." Drawing on the recent Supreme Court decision in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), Judge Elfvin held that the arrest warrant was invalid. *Franks v. Delaware* establishes the proposition that for a search warrant to be valid, it cannot be based on deliberate or recklessly asserted false statements of the affiant in the affidavit that purports to set forth

probable cause. If, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." 438 U.S. at 156, 98 S.Ct. at 2677. Judge Elfvin, applying these principles to the affidavit for the arrest warrant here, ruled that after excising the false statements, "the existence of probable cause for the issuance of the arrest warrant becomes problematic and conjectural . . . ." Therefore, he concluded, he had to suppress the evidence obtained by execution of the search warrant.

■ We need not decide whether Judge Elfvin correctly applied *Franks v. Delaware* because we believe he proceeded on a false premise in ruling that the admissibility of the evidentiary proceeds of the search warrant was inexorably tied to the legality of the arrest warrant. The seizure was made pursuant to a search warrant. The affidavit in support of the search warrant clearly recites probable cause to justify a search, in that the agent procuring the warrant had "observed marijuana, cutting and packaging material, all laying in plain view . . ." Appellees challenge neither the reasonableness of the agent's conclusions nor his good faith belief as to what he saw, and therefore do not question that there was apparent probable cause for the issuance of the search warrant.

Appellees' basis for challenging the seizure, therefore, is that the requirement of the plain view doctrine, that "the agents must be lawfully on the premises," *United States v. Berenguer,* 562 F.2d 206, 210 (2d Cir. 1977), construing *Coolidge v. New Hampshire,* 403 U.S. 443, 464–71, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion), was not met, or, put another way, that the viewing of the contraband by the agents was the fruit of an illegal arrest. By either statement of the theory, the legality of the seizure is "bootstrapped" to the overall legality of the arrest, not merely, as Judge Elfvin stated, to the legality of the arrest warrant.

■ The distinction is crucial because the arrest was legal if the arresting officers had probable cause to make the arrest. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). This is so even if the arrest warrant was invalid. See, e. g., *Mayer v. Moeykens,* 494 F.2d 855, 858 (2d Cir.), cert. denied, 417 U.S. 926, 94 S.Ct. 2633, 41 L.Ed.2d 229 (1974); *United States v. Hall,* 348 F.2d 837, 841–42 (2d Cir.), cert. denied, 382 U.S. 947, 86 S.Ct. 408, 15 L.Ed.2d 355 (1965). See also *Giordenello v. United States,* 357 U.S. 480, 488, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), suggesting that in the event of a new trial in that case, the government could seek to justify the petitioner's arrest without relying on the warrant just held invalid. Appellees do not claim that the arresting officers lacked probable cause. Indeed they could not, since it is obvious from the facts found by Judge Elfvin that the arresting officers were in possession of ample facts from trustworthy sources to warrant prudent men in believing that appellees had committed an offense. See *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). As Judge Elfvin commented during the suppression hearing, probable cause for the arrest was "super abundant." Therefore, the arrest was legal even if the arrest warrant was not. The search was not the fruit of an illegal arrest because the arrest was legal. When the agents viewed the contraband from Forbes's doorway, after accompanying Forbes there following his request that he go to his apartment to inform his wife of the arrest, they were on premises where they had a lawful right to be, and thus the requirements of the plain view doctrine were fully met. Appellees argue to us that Forbes did not request to go to his apartment to inform his wife, but rather that government agents led him there. Judge Elfvin found otherwise, however, and since that finding was supported by the record, we see no reason to disturb it on appeal.

### III

We now turn to the issue whether Judge Elfvin abused his discretion in dismissing

the indictment because of misconduct by the government found by him to have occurred in this case. Specifically, the question is whether the most serious misconduct found, the false testimony by government witnesses at the suppression hearing, justifies the drastic remedy of dismissal.

In *United States v. Fields,* 592 F.2d 638 (2d Cir. 1978), Judge Timbers pointed out for this court that we have upheld the dismissal of an indictment only in very limited and extreme circumstances. In such cases, there was a need either to eliminate prejudice to a defendant in a criminal prosecution, where it was impossible to do so by imposition of lesser sanctions, or to deter a pattern of demonstrated and longstanding widespread or continuous official misconduct. Id. at 647–648, discussing such prior opinions of this court as *United States v. Jacobs,* 531 F.2d 87 (2d Cir.), vacated and remanded, 429 U.S. 909, 97 S.Ct. 299, 50 L.Ed.2d 277, aff'd on remand, 547 F.2d 772 (2d Cir. 1976), cert. dismissed, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978), and *United States v. Estepa,* 471 F.2d 1132 (2d Cir. 1972). See also *United States v. Lai Ming Tanu,* 589 F.2d 82 at 86 (2d Cir. 1978). While these may not be the only conceivable circumstances in which we would uphold a dismissal, cf. *United States v. McCord,* 166 U.S.App.D.C. 1, 15–18, 509 F.2d 334, 348–51 (1974) (en banc) (dictum), cert. denied, 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975), we emphasize here, as was emphasized in *Fields,* that the sanction is so drastic that, especially where serious criminal conduct is involved, it must be reserved for the truly extreme cases.

This is not such a case. Appellees suffered no prejudice by the misconduct that was found to have occurred. There is no claim that the grand jury that indicted appellees was misled in any way. As stated in Part II, there was ample probable cause for the arrest. No evidence was gathered that would not have been obtained absent the misconduct. If anything, the appellees might even have been advantaged by the entire sequence of events. The misstatements in the affidavit weakened, rather than strengthened, the showing of probable cause to the Magistrate. Also, appellees now have substantial material with which to impeach important government witnesses if, in the face of such impeachment material they testify at trial. As for deterrence of official misconduct as a justification, we note that there was no finding of widespread or continuous official misconduct of the dimensions necessary to warrant imposition of the sanction of dismissal.

We emphatically do not condone the insertion of false material into affidavits for arrest or search warrants. Such an egregious practice defeats the whole point of the procedure, having a judicial officer make an independent assessment of whether probable cause exists. See *Franks v. Delaware,* supra, 438 U.S. at 162–64, 98 S.Ct. at 2680–81. Obviously, other methods for protecting informants can be devised. We trust, however, that what occurred here was an isolated instance of erroneous judgment and that it will not recur. We regard as even more serious the lying in court by government officials, which is what Judge Elfvin found had occurred. However, we think dismissal of the indictment was an inappropriate response. There are other disciplinary measures, ranging from intradepartmental sanctions to perjury prosecutions, that could be imposed if warranted. There is simply no need to thwart the public interest in prosecuting serious crimes unless the government misconduct is widespread or extraordinarily serious. This was not the case here, and therefore it was an abuse of discretion to dismiss the indictment.

In sum, we reverse the order suppressing the evidence seized, and we remand for reinstatement of the indictment and further proceedings consistent with this opinion.

LUMBARD, Circuit Judge (concurring and dissenting):

Although I agree that the indictment should be reinstated and the order suppressing the evidence reversed, I cannot agree

that there was any basis for the district court's finding that the agents had sworn falsely at the suppression hearing. The agents testified that when they were applying for the arrest warrants for Broward and Forbes, they had explained to the magistrate that the name "Carcer" was fictitious and that the fiction of an informant was necessary to protect Carriger, whose life had been threatened by Broward. However misguided their method of protecting Carriger, there can be no doubt that their motives were proper. There was no reason for them not to advise the magistrate of the true facts. Although the magistrate remembered talking to the agents for almost two hours on the day he issued the warrants, he testified that he could not remember the details of his meeting with the agents. The magistrate also expressed the opinion that he would not have issued a warrant had he known that it contained misstatements. The testimony of the magistrate was equivocal and speculative and not "definite and clear" as the district judge thought. Indeed, in light of the district judge's attitude, the magistrate's testimony seems to have been far more self-protective than enlightening. I would hold the district court's finding that the agents had lied to be clearly erroneous.