UNITED STATES of America,

v.

Calixto AGAPITO, Martha Calderon and Horacio Rueda, Defendants.

No. 79 Cr. 135 (IBC).

United States District Court,
S. D. New York.

Oct. 5, 1979.

Robert B. Fiske, Jr., U.S. Atty., S.D.N.Y., New York City, for the United States; Jeffrey E. Livingston, Asst. U.S. Atty., New York City, of counsel.

Peter M. Antioco, Brooklyn, N.Y., for defendant Calixto Agapito.

Raymond S. Sussman, Brooklyn, N.Y., for defendant Martha Calderon.

Charles Sutton, New York City, for defendant Horacio Rueda.

## OPINION

IRVING BEN COOPER, Senior District Judge.

The defendants Calixto Agapito, Martha Calderon and Horacio Rueda were arrested by agents of the Drug Enforcement Agency (DEA) on February 22nd, 1979. Defendant Rueda was charged with one count of conspiring to violate the Federal narcotics laws (Count 1), two counts of possession of cocaine with intent to distribute (Counts 2 and 4) and one count of possession of a firearm during the commission of a felony (Count 3). Defendants Agapito and Calderon were charged with one count of conspiracy (Count 1) and one count of possession of cocaine with intent to distribute (Count 4).[1]

---

1. The indictment reads as follows:

Count 1: From on or about the 5th day of February, 1979, and continuously thereafter up to and including the date of the filing of this indictment [March 1, 1979], in the Southern District of New York, Calixto Agapito, Martha Calderon and Horacio Rueda, the defendants and others to the Grand Jury known and unknown, unlawfully, intentionally and knowingly combined, conspired, confederated and agreed together and with each other to violate Sections 812, 841(a)(1) and 841(b)(1)(A) of Title 21, United States Code. It was part of said conspiracy that the said defendants unlawfully, intentionally and knowingly would distribute and possess with intent to distribute Schedule II narcotic drug controlled substances, to wit, cocaine, the exact amount thereof being to the Grand Jury unknown in violation of Sections 812, 841(a)(1) and 841(b)(1)(A) of Title 21, United States Code.

Count 2: On or about the 22nd day of February, 1979, in the Southern District of New York, Horacio Rueda, the defendant, unlawfully, intentionally and knowingly did distribute and possess with intent to distribute a Schedule II narcotic drug controlled substance, to wit, approximately eight kilograms of cocaine. (Title 21, United States Code, Sections 812, 841(a)(1) and 841(b)(1)(A) and Title 18, United States Code, Section 2.)

Count 3: On or about the 22nd day of February, 1979, in the Southern District of New York, Horacio Rueda, the defendant, unlawfully, wilfully and knowingly did carry a firearm, to wit, a .22 caliber derringer, during the commission of a felony for which he could be prosecuted in a Court of the United States, to wit, violations of Title 21, United States Code, Sections 812, 841(a)(1) and 841(b)(1)(A) and 846. (18 U.S.C. § 924(c)(2).)

Prior to trial, defendants moved for suppression of evidence and dismissal of the indictment as being the result of illegal arrests, searches and seizures, and illegal investigatory tactics, in contravention of the Fourth, Fifth and Sixth Amendments of the Constitution of the United States.[2]

## Facts

On the afternoon of February 21, 1979, an informant called DEA headquarters and spoke to Special Agent Victor Aponte, informing him, in substance, that a "close friend"[3] of the informant, identified by first name, had been in Room 1701 of the Sheraton-Centre Hotel at 810 Seventh Avenue in Manhattan where the friend had seen and sampled approximately four kilograms of cocaine. The informant had, in the past, furnished similar information to the authorities from the same source and it had proven reliable. The informant himself was considered reliable by the DEA agents, for his information on several occasions lead to convictions and at least two search warrants which survived attack.

Agent Aponte testified that Mr. X had told the informant: he had been in Room 1701 before; the room was occupied by a Colombian man (later identified as the defendant Agapito) and a Cuban woman named Martha who came from Miami; Martha had been staying at the hotel for several days; and Martha and Agapito planned to leave New York by the weekend.

Special Agents Bell and Forteza were sent to the Sheraton, and confirmed with the hotel security personnel that Room 1701 was occupied by one Martha Calderon who had given a Miami address, had stayed in the room approximately one week, and had paid in cash at a double rate on a daily basis.

The agents obtained access to Room 1702 which adjoined Room 1701, a single locked door between. By pressing the naked ear against the crack of the adjoining door, the agents were able to overhear noises and parts of conversations emanating from Room 1701. The agents remained in Room 1702 and were joined by other agents who took turns with Bell and Forteza at pressing their ears against the door. They also maintained surveillance at the entry to Room 1701.

The agents testified to hearing many fragments of conversations between a man and a woman, and gathered that someone was to visit the room the next day, Febru-

Count 4: On or about the 22nd day of February, 1979, in the Southern District of New York, Calixto Agapito, Martha Calderon and Horacio Rueda, the defendants, unlawfully, willfully and knowingly did distribute and possess with intent to distribute a Schedule II narcotic drug controlled substance, to wit, approximately one kilogram of cocaine. (Title 21, United States Code, Sections 812, 841(a)(1) and 841(b)(1)(A) and Title 18, United States Code, Section 2.)

2. On April 30, 1979, we entered a memorandum endorsement on a motion by defendants to suppress evidence seized by the Government pursuant to alleged illegal arrests and searches. The memorandum was entered following a four-day hearing held April 4, 5, 9 and 10, 1979. The memorandum stated on p. 3: "If our commitments in many other matters permit, it is our intention to file an opinion at some distant date. It must be distinctly understood that the order above is our final disposition of the motions to suppress." The instant opinion elaborates the factual and legal findings on which we based our decision to deny the motion to suppress.

Defendants were tried before a jury, commencing May 9, 1979 and a verdict was entered May 23, 1979 finding all three defendants guilty as charged.

3. In the course of the hearing, certain facts were brought to the attention of the court which compelled us to direct that the parties refer to the source of the information as "Mr. X," rather than "a close friend" of the informant. An affidavit, dated April 9, 1979, was submitted by the Assistant United States Attorney in the case setting forth the identity of the "close friend" and requesting that the affidavit be sealed in order to protect the source. This affidavit was made a part of the record and ordered sealed. While we find no evidence of misrepresentation or intent to mislead, the language used by the Government, in the proof adduced as to the "close friend," leaves much to be desired; it is limited and demonstrates the exercise of poor judgment. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *U. S. v. Broward*, 594 F.2d 345 (2d Cir.), cert. denied, —— U.S. ——, 99 S.Ct. 2882, 61 L.Ed.2d 310, (1979).

ary 22, 1979. After a telephone conversation, the woman, later identified as Martha Calderon, was overheard to say in effect: "He is coming over about 11:00 a. m. tomorrow."

In mid-afternoon on February 22, 1979, DEA agents observed a male, later identified as Horacio Rueda, carrying a shoulder bag and an attache case, enter Room 1701, accompanied by a small boy. The only other activity in and out of Room 1701, since the agents commenced surveillance on February 21st, occurred when Martha Calderon left the room (followed by Agent Forteza), made a phone call in the lobby and returned; also when room service delivered food to the room.

From their position in Room 1702, the agents were able to hear greetings when Rueda entered Room 1701, conversation accompanied by ripping or tearing sounds as well as a shuffling sound, suggesting the tearing of tape and/or the counting of money. Agent Aponte heard one of the men say: "one-five-zero-zero-zero."

Soon after, Rueda left the room with the small boy, without the shoulder bag and attache case. Rueda was arrested by agents in the lobby of the hotel, searched in the DEA car outside the hotel and then taken to DEA headquarters. At the time of his arrest, he was carrying a loaded .22 caliber derringer.

After being advised of his rights at DEA headquarters, Rueda stated to a Spanish-speaking agent that he had just taken cocaine to the room. Rueda's statement was conveyed, by telephone, to the agents in Room 1702.

At approximately 4:00 p. m. on the afternoon of February 22nd, Agapito, carrying an attache case (apparently the same attache case Rueda had brought to the hotel room), and Martha Calderon left Room 1701. They were arrested just outside the hotel, the attache case was seized from Agapito, forced open, and found to contain $29,000 cash. Thereafter agents entered, secured and remained in Room 1701 in order to continue their investigation, apparently expecting additional phone calls relating to the sale of drugs would come there. They did not at that time search the room but opened the adjoining door to Room 1702 where Agapito and Calderon were temporarily detained.

At approximately 6:00 p. m. on February 22nd, the phone rang in Room 1701. Agent Forteza, a Spanish-speaking agent acting undercover, answered the phone. A female caller, later identified as Ligia Atehortua, inquired whether Horacio and her son had been to the hotel room. Ligia called back twice more, and finally gave permission to Agent Forteza, posing as an associate of Agapito and Calderon, to come to her apartment, 3B, 328 East 85th Street, in New York City.

Upon their arrival at the apartment, Ligia admitted Agent Forteza, followed by other agents, into the apartment. Forteza identified himself as a DEA agent, and obtained Ligia's consent verbally and later in writing to search the apartment. When the agents entered Apt. 3B, bags of white powder were in plain view in the living room. The search turned up approximately eight kilograms of cocaine, several kilograms of isonicotinamide, a cutting agent, various other narcotics paraphernalia, also photographs of Horacio Rueda and the small boy who had accompanied him to Room 1701.

The next morning, February 23rd, upon the affidavit of Agent Aponte, the agents obtained a search warrant for Room 1701, which previously had simply been occupied and secured. The affidavit contained much, but not all, of the information then known to the agents. The subsequent search of Room 1701 revealed one kilogram of cocaine in a suitcase with female clothing in it. The key to the suitcase was taken from Agapito at the time of his arrest.

### The instant motions

Defendants base their motions to suppress on the issues of law to be discussed shortly, and on the following interpretations of the testimony adduced at the hearing.

1. Defendants claim that the Government failed to properly identify the source of its information—either the informant or his so-called "friend," "Mr. X." It is implied that the agents either prevaricated or otherwise illegally obtained the information they had as to the identity and activities of these defendants, and that, in initiating their investigation, the informant's admitted lack of first-hand knowledge of the activities in Room 1701 operated to defeat or otherwise cast doubt on the validity of his information, so that all which followed was irrevocably tainted.

2. Defendants allege that, once ensconced in Room 1702, the agents illegally established, without a warrant, "an eavesdropping surveillance center to systematically overhear the private conversations of the occupants . . . of Room 1701." Defendant Rueda's Post-hearing Memorandum of Law, at 8–9. They claim that the agents' method of putting their ears to the crack in the door adjoining Room 1701 amounts to a "mechanical" eavesdropping in violation of statutes requiring a warrant for such activity.

Defendants attack the credibility of the agents' testimony as to the snatches of conversation and noise they overheard between the evening hours of February 21st and the early afternoon of February 22nd. They direct a substantial portion of their attack to the testimony concerning the conversation between Agents Torres, Papantoniou, Aponte and the defendant Rueda, when he was brought to DEA headquarters following his arrest. The Government's testimony showed that Rueda told Agent Torres (they conversed in Spanish) that he had taken cocaine into Room 1701 and had demonstrated with his hands the size of the package delivered.

Defendants describe the testimony of the agents on this point as: "riddled with inconsistencies and contradictions, evasions,

tailoring and fabrications." They argue that it is impossible to believe that Rueda, recently taken into custody "would make a monumentally incriminating and suicidal statement that he delivered cocaine to the room."

While we did not find the testimony of the agents on this conversation a model of smoothness and consistency, we found their testimony, delivered in a convincing manner, credible and falling within the orbit of this court's experience in matters of this kind. We do not conclude, as defendants would have us do, that the agents fabricated this statement; rather, we view it as a link in the chain of evidence of probable cause supporting the contention that these defendants were engaged in criminal activity.[4]

Defendants raise many more objections to the conduct of the agents in the course of their investigation of the alleged crimes before us, going so far as to allege physical abuse of the defendants by the agents, a position we completely reject.

### Issues of Law

The basic issues of law raised by defendants' pre- and post-hearing memoranda relate to the validity of the informant's tip as a basis for probable cause warranting arrest of the defendants, the securing of Room 1701 and its subsequent search pursuant to a warrant. There is also a challenge to the consent search conducted at Apartment 3B.

Additionally, the credibility of the agents and the nature of their investigatory tactics is severely impugned and presented to this court as additional grounds for the suppression of evidence and dismissal of the indictment.

■ *Standing.* A threshold issue to be considered is whether the parties have standing to raise various alleged violations

---

4. A disturbing incident did occur relative to this matter wherein, prior to the hearing, the Government prosecutor represented to the court and to defense that Agent (Ms.) Torres had stated to him that Rueda, after admitting he took cocaine into the room, recanted his statement. At the hearing, Torres denied firmly and unequivocally that any such recanting occurred, and the Assistant United States Attorney candidly admitted he was in error in believing she had said so.

of their Constitutional rights, thus entitling them to suppression of the evidence gathered. Applicable to Rueda is the rule of automatic standing enunciated in *Jones v. U. S.*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), where a defendant charged with possession is automatically granted standing to object to constitutional violations of the rights of co-defendants. Thus, Rueda is entitled to challenge the legality of all the contested evidence—including, of course, his confession—and he has in fact done so. *U. S. v. Riquelmy*, 572 F.2d 947 (2d Cir. 1978); *U. S. v. Penco*, No. 198 (slip opinion) (2d Cir. September 6, 1979).

■ It is clear that the defendants Agapito and Calderon have standing to challenge the legality of their own arrests, and of the search and seizure of evidence found in Room 1701, in which they had a legitimate expectation of privacy and a substantial interest. *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). Additionally, being charged with possession of that evidence, they must have standing to contest its admissibility. *Jones v. U. S., supra.* However, Agapito and Calderon do not have standing to challenge the legality of Rueda's arrest and the search and seizure of evidence in Apt. 3B, under the holding in *Brown v. U. S.*, 411 U.S. 223, 229, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208 (1973):

> [T]here is no standing to contest a search and seizure where . . . the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure.

■ The seizure of evidence, even if tainted as to one party due to illegalities, may not be contested by another party absent the criteria stated above; the "fruit of the poisonous tree" doctrine is not applicable to those whose *own* Fourth Amendment rights have not been violated. *Wong Sun v. U. S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *U. S. v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).

We observe that all three defendants have joined in the arguments presented in Rueda's behalf. Thus, the validity of the constitutional arguments raised as to all the evidence can be considered at one time, without reaching the issue of who has the standing to object to which items of evidence.

■ *Arrests.* Defendants contend that all three arrests were illegal in that they were made without probable cause. The standard to be applied, as defendants concede, is whether the arresting officer knows of sufficient facts and circumstances to justify his belief that a crime has been or is being committed. *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The defendants vigorously deny that the agents could have obtained any basis for such a belief from the informant's tip, from surveillance of the hotel room, or from Rueda's statement, either because the acquisition of that information was illegal or because it was completely fabricated by the agents.

■ We believe the Government has sustained its burden of showing that sufficient evidence was known to the agents to justify the arrests. "Probable cause to arrest exists when an officer has knowledge of facts and circumstances 'sufficient to warrant a prudent man in believing' that an offense is being or has been committed." *U. S. v. Rueda*, 549 F.2d 865, 870 (2d Cir. 1977); *Brinegar v. U. S.*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

■ Here, the agents acted upon a detailed tip provided by a reliable informant, substantial parts of which their own independent investigation corroborated prior to any arrest. The fact that some of the corroborating information was susceptible of innocent interpretation does not undermine the validity of its use to establish probable cause. *U. S. v. Rodriguez*, 532 F.2d 834 (2d Cir. 1976). We say again, we found the total testimony of the agents convincing

and determinative of the issues to which it was addressed.

■■■■ There were sufficient circumstances surrounding Rueda's arrival at and the departure from the room, in light of the prior comments and noises overheard by the agents during their surveillance, to justify the belief that a crime had been or was being committed. Those circumstances justified the exigent arrest of Rueda immediately upon his departure from the hotel room. Rueda's subsequent admission that he had taken cocaine into the room afforded further substantial basis for the arrests of Agapito and Calderon.

*The searches.* Defendants claim that the agents' entry into Room 1701, following the arrests of Agapito and Calderon, was illegal; and that the evidence and information obtained thereby, the cocaine found subsequent to the search warrant obtained the next day, and the calls which lead the agents to Apt. 3B and the discovery there of additional cocaine, all added up to tainted evidence. They argue that there was no legitimate basis for the agents' activities, that they had no probable cause to believe that contraband was present, likely to be tampered with, and justifying their entry into the room to secure it.

■■■ On the contrary, we find that, following the arrest of the defendants, the agents were justified in entering Room 1701 to protect against obvious risks. In the belief that narcotics, a highly disposable commodity, might be present in Room 1701 and that other persons might be inside, the agents acted properly in entering the room to secure it and prevent the destruction of evidence. *U. S. v. Campbell,* 581 F.2d 22 (2d Cir. 1978). Their intrusion falls short of a search. The agents acted reasonably in protecting the evidence that they had probable cause to believe was present.

■■■ Additionally, the agents had the belief or reasonable expectation that telephone calls would be made to the room by associates of the defendants in furtherance of their criminal activity. The paramount importance of continuing the investigation

and possibly discovering the identity of other members of this conspiracy further justified the presence of the agents in the room in order to intercept telephone calls. *U. S. v. Campbell, supra.*

Defendants argue that the search of Apt. 3B was unlawful because: (1) it was a fruit of the agents' earlier improper activities; and (2) Ligia's consent to the search was involuntary.

Assuming that the agents legitimately arrived at 328 East 85th Street, Apt. 3B, we must examine the circumstances of their entry and search of the premises. The Government's witnesses testified that after identifying themselves, they were admitted to the apartment by Ligia. They asked her permission to search, which she granted verbally and later by filling out and signing a consent to search form. According to the Government's witnesses, Ligia cooperated voluntarily in their investigation during a period of several days, apparently being interested primarily in retrieving her son, the small boy who had accompanied Rueda to the hotel room, and who had been turned over by the agents (arresting Rueda) to the child welfare authorities.

■■■ Defendants allege that the agents intimidated Ligia, that her consent was merely a submission to authority, and that her signing of the form was coerced, thereby invalidating the evidence seized. *Johnson v. U. S.,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *U. S. v. Reed,* 572 F.2d 412 (2d Cir. 1978). Although Ligia was not available to testify at the hearing, her whereabouts being unknown, we examined with care the testimony and extensive cross-examination of the agents who searched the apartment and dealt with Ligia. We found no indication that Ligia's consent to the search was coerced. Accordingly, we hold that the search was lawful and the evidence obtained properly before us. *U. S. v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

Room 1701, including the suitcase containing the cocaine, was searched by the agents on February 23rd, only after they obtained a search warrant from the Magistrate. The supporting affidavit was prepared by Agent Aponte; it afforded a more than adequate factual basis for the Magistrate's finding of probable cause sufficient to support the search warrant. The primary bases were the reliable informant's information as corroborated by the agents' own observations, and Rueda's post-arrest admission that he had taken cocaine into Room 1701. Additional impressive and convincing facts came to light: the discovery of cocaine at Apt. 3B, the fact that Rueda was carrying a loaded revolver and Agapito was ·carrying substantial amounts of cash when arrested.

Defendants contest the legality of the inclusion in evidence of the informant's tip, and Rueda's confession, under the authority of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. U. S.*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *U. S. v. Karathonas*, 531 F.2d 26 (2d Cir. 1976); *Beck v. Ohio, supra* ; and *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). They insist that both factual items are fabrications of the DEA agents.

#### Informant's tip

■ There is a somewhat unusual issue posed by the fact that the informant's tip contained the personal observations of the informant's "close friend," referred to at the hearing as "Mr. X." However, the affidavit clearly recites the informant's previous reliability, supporting evidence of which was adduced at the hearing; further, that the informant had used the same source previously with results substantiating his reliability. Additionally, the affidavit recites how the informant came by his information, and provides sufficient underlying circumstances tending to corroborate the reliability and credibility of the information from "Mr. X." The crucial question is not "whether the affiant can attest to the reliability or credibility of the second individual,

but whether the information furnished by the informant, taken as a whole in light of the underlying circumstances, can be said to be reliable." *U. S. v. Smith*, 462 F.2d 456, 460 (8th Cir. 1972), cited approvingly in *U. S. v. Fiorella*, 468 F.2d 688, 691 (2d Cir. 1972).

In this case, the manner in which "Mr. X" obtained his information carries its own indicia of reliability. He maintained his information was based on personal observations. Moreover, it can readily be inferred that "Mr. X" was either a witness to, or a participant in, a criminal narcotics transaction. His statements were thus in the nature of admissions against interest and therefore inherently reliable. *Spinelli v. U. S.*, 393 U.S. at 425, 89 S.Ct. 584. Another factor supporting the reliability of the information was the specificity regarding the identity and location of the suspects. This information is not of the type or detail that can be derived from "casual rumor." *Spinelli, id.* at 416, 89 S.Ct. 584.

■ The credibility of the hearsay information given to Agent Aponte by the informant may be established by corroboration of essential elements of the information, even elements which otherwise appear to be innocent. *U. S. v. Gonzalez*, 555 F.2d 308 (2d Cir. 1977). The agents independently established the correctness of much of the information given; their inquiry provided substantial corroboration of the information that significant narcotics activity was being conducted in Room 1701. *U. S. v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

■ Consequently, we find that the credibility and reliability of the information given, along with the corroborative findings of the authorities, in and of themselves, sufficiently establish probable cause. *Aguilar v. Texas, supra; Spinelli v. U. S., supra; U. S. v. Dunloy*, 584 F.2d 6 (2d Cir. 1978).

*Rueda's Confession.*. Rueda's confession, as set out in Agent Aponte's affidavit, was by itself, a sufficient basis for the Magistrate's finding of probable cause. Defendants, of course, contend that the confession should not have been considered, as it was, in fact, a complete fabrication. We have

already stated our reasons for choosing neither to believe nor accept the defendants' repeated condemnation on this score.

■ In sum, we find that a search warrant may issue "when the facts are sufficient to satisfy a reasonably prudent detached and neutral person that a crime is being committed or evidence of it kept on the premises to be searched and that the informant's information has been obtained by him in a reasonably reliable way rather than through neighborhood gossip, conjecture, or mere suspicion." This standard has been amply fulfilled by the affidavit in this case. *U. S. v. Karathonas, supra*, at 29–30; *U. S. v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *U. S. v. Rueda, supra.*

*Investigatory tactics.* None of the Government's evidence, even that of tertiary value, finds acceptance by any of the defendants who decry all the activities of the DEA agents in tracking them down and seizing the contraband found in their possession. Defendants insist the agents falsely testified about the informant's tip; that it was either a fabrication or illegal as a matter of law. They have objected to the surveillance and eavesdropping conducted by the agents in Room 1702, claiming that by pressing their ears against the crack in the door, the agents engaged in a "mechanical eavesdropping" all in violation of 18 U.S.C. § 2510 et seq., and the doctrine of *Katz v. U. S.*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). They vigorously insist that Rueda's confession to agents (that he took cocaine into the room) following his arrest was a fabrication. They contest the seizure and search of Agapito's attache case, the entry into Room 1701 following the telephone calls, and the "consent" search of Apt. 3B.

■ We are convinced by the total proof adduced before us that the informant did exist, that he imparted the information testified to and subsequently corroborated by the agents, and that the information was sufficiently reliable and credible, as a matter of law, for the agents to act upon it.

■ The surveillance by the agents, conducted in Room 1702, clearly does not constitute a violation of the mechanical eavesdropping statute. While it is true that guests in a hotel room are entitled to the expectation of privacy, *Johnson v. U. S., supra; U. S. v. Kendall Isom*, 588 F.2d 858 (2d Cir. 1978), there is no protection under the law where noises emanating out of a room and audible to the unaided ear, are overheard so long as the agents were lawfully where they were—in Room 1702. The language of 18 U.S.C. §§ 2510(2), (4) and (5), 2511 and 2515 does not proscribe the interception and use, *by the unaided ear*, of noises and talking loud enough to be overheard beyond the confines of Room 1701. *U. S. v. Llanes*, 398 F.2d 880 (2d Cir. 1968); *Katz v. U. S., supra.*

■ The seizure of Agapito's attache case by the arresting agent and immediate opening thereof, was a reasonable search incident to a lawful arrest—well within the limits of this exception to the warrant requirement. *U. S. v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

The appropriateness of the agents' actions in entering and securing Room 1701 subsequent to the arrest of Agapito and Calderon is clear. Absent a search without a warrant (and it is the sworn testimony of all the agents that no search was conducted at that time), the doctrine of exigent circumstances entitled the agents to take the actions they did in order to protect evidence and their own safety. *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

■ In view of our finding that the agents were lawfully in Room 1701, we further find that their actions in answering the telephone in order to pursue their investigation were reasonable, in light of the evidence they had obtained that the phone was being used to further the sale of narcotics. No conversation of any defendant was intercepted, and their need to immediately pursue the investigation outweighs the prejudicial effect, if any, of what the agents did. *U. S. v. Ceccolini, supra; U. S. v. Scios*, 191 U.S.App.D.C. 254, 590 F.2d 956 (D.C. Cir. 1978).

*Conclusion*

We have found that the actions of the DEA agents throughout their investigation were proper. We find that Ligia's consent to the search of Apt. 3B was voluntarily given. As to defendant Rueda's confession, we simply offer the comment that we frequently find that many a defendant makes a damaging remark under the emotional strain of arrest, only to regret it later. We examined carefully into the totality of defendants' allegations of wrongdoing, and allowed them full scope to develop their points. We do not support their opposition.

We emphasize our findings that the agents behaved properly in all respects as a matter of law, including, of course, their conduct toward the defendants; that their testimony at the hearing was detailed, complete, credible, and unshaken under defendants' sharp cross-examination.

Accordingly, we felt constrained to, and did, deny the motions to suppress evidence on the grounds that the arrests, searches and seizures were lawful and based on probable cause.

SO ORDERED.